2001 ME 7

**BOARD OF OVERSEERS OF THE BAR**

v.

**Thomas M. MANGAN.**

Supreme Judicial Court of Maine.

Argued Dec. 12, 2000.
Decided Jan. 16, 2001.

J. Scott Davis, Bar Counsel, Karen G. Kingsley, Asst. Bar Counsel (orally), Augusta, for plaintiff.

Thomas M. Mangan, Lewiston, for defendant.

Panel: WATHEN, C.J., and RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Thomas Mangan appeals from the judgment of a single justice of the Supreme Judicial Court (*Saufley, J.*) finding that he violated several provisions of the Maine Bar Rules[1] and disbarring him from the practice of law. Mangan contends, *inter alia*, that (1) the single justice erred in finding both an attorney-client relationship, and the search for the complainant's daughters' fathers constituted the practice of law, (2) the single justice erred in finding that Mangan made im-

---

1. The single justice found that:

 1. Mangan made inappropriate use of his client escrow account in violation of M. Bar R. 3.1(a) and 3.6(e)(1), (2);
 2. Mangan neglected legal matters entrusted to him and failed to account for receipts related to his work in violation of M. Bar R. 3.1(a); 3.6(a)(3); and 3.6(e)(2)(iii); and
 3. Mangan engaged in a sexual relationship with a client which relationship adversely affected his representation of the client and abused the attorney-client relationship in the context of the sexual relationship in violation of M. Bar R. 3.1(a); 3.2(f)(2), (3), (4); 3.4(b)(1); 3.4(f)(1); and 3.6(a)(3).

proper use of his client escrow account, and (3) he was denied a fair and impartial trial. We disagree and affirm.

[¶ 2] The single justice found Mangan was a lawyer who had practiced in the Lewiston area since approximately 1975. The complainant, who is Vietnamese, has lived in this country for approximately twenty-eight years. She has three adult daughters, all of whom have different fathers. Sometime in the early 1980's, the complainant approached Mangan to seek his legal assistance in obtaining child support from the father of one of her daughters. Mangan agreed to assist her but shortly thereafter was discharged. Mangan had no further contact with the complainant until she sought out his assistance again in 1990. She had received $4,000 in settlement of a personal injury claim. Because her medical bills exceeded that amount, she asked Mangan to negotiate with the medical providers in order to settle her existing obligations. Mangan agreed to assist her. He did not enter into a fee agreement with the complainant and asserts he expected to do the work without compensation. He took the $4,000 check, deposited it in his client escrow account, and then paid a number of her medical bills with the money. Despite the payments made by Mangan, the complainant continued to receive phone calls from creditors and was never clear on which bills had been paid and which had not. Mangan never told the complainant that he had concluded the work and never gave her a final accounting for the payments he had made on her behalf.

[¶ 3] The complainant next approached Mangan about locating the fathers of her two older daughters. Mangan told the complainant that he was good at searches, that he would undertake the search for her, and that he expected the search would take approximately six months. She asserts that he told her she could pay him when the search was completed. Again, Mangan did not specify his expected com-

pensation and did not enter into any fee agreement with the complainant.

[¶ 4] Sometime after agreeing to undertake the search for the fathers, Mangan began a consensual sexual relationship with the complainant. Mangan initiated that relationship and the complainant was, for a while, a willing participant. The single justice specifically found that at the time the sexual relationship began, Mangan had given the complainant no final accounting on the medical bills and was still searching for her daughters' fathers. The complainant was living with her husband and their daughter when the relationship with Mangan began. One evening when the complainant was visiting at Mangan's office, her husband appeared at the office. After a brief discussion, resulting in moments of uncomfortable silence, the complainant emerged from the back room and left the office with her husband. Subsequently, the complainant and her husband separated, and after that separation, the complainant sought assistance to obtain a court order requiring her husband to pay child support for their child. Mangan understood that he might become a witness to the proceeding because of the incident at his office. He therefore referred the complainant to another lawyer. In order to pay that lawyer's retainer, Mangan put his own money into his client escrow account and then wrote a check to the lawyer from that account.

[¶ 5] Eventually the relationship between Mangan and the complainant became strained. During this time, the complainant was struggling with depression and also began demanding money from Mangan.

[¶ 6] The single justice made the following relevant conclusions:

I am convinced that when [the complainant] came to understand fully that Mr. Mangan had abused his relationship with her, she attempted to obtain a financial advantage through that knowledge. Her repeated phone calls and her demands for money from October of

1996 through June of 1997 belie her assertion that she just wanted to end the relationship completely in the fall of 1996. I am also convinced that the sexual relationship between Mr. Mangan and [the complainant], spanning several years, was, at least initially, consensual. I am not persuaded that she originally had sex with him only, as she said, because "he [sic] my lawyer." Nor do I believe that she asked him about his search for the fathers "every day," over the course of the relationship, thereby keeping the attorney-client relationship foremost in his mind.

I am convinced, however, that Mr. Mangan began the sexual relationship with [the complainant] during a time when he was acting as her attorney. I am also convinced that Mr. Mangan used information gained in his attorney-client relationship to initiate the sexual relationship and in so doing took advantage of her personal situation as well as her desire to find the fathers.[2] Further, I am persuaded that he used that information to manipulate [the complainant] in order to maintain a continuing sexual relationship at a time when she would have chosen to cease her contact with him.

That Mr. Mangan used his search for the fathers to manipulate [the complainant] became clear through his own testimony to that effect that, although he did find one daughter's father, . . ., he did not tell [the complainant], choosing instead to "hold onto it" until he had news about both fathers. When he became angry with her, probably in late January of 1997, he "chucked it all," thereby destroying any important information he had obtained during the search. It is evident then that he misled [the complainant] regarding the success of his search, and he destroyed or made unavailable to her whatever results he had obtained when their personal relationship became difficult.

In sum, Mr. Mangan allowed his personal relationship with [the complainant] to affect his work for her, he took advantage of knowledge gained in his attorney-client relationship with [the complainant] in order to pursue and continue that sexual relationship, and he used his search for the fathers to coerce a continuing sexual relationship with her.

### A.

■ [¶ 7] We must first determine whether an attorney-client relationship existed and then whether Mangan's actions constituted "the practice of law." The single justice's finding that there was an attorney-client relationship is a factual finding that will be upheld unless clearly erroneous. *Board of Overseers of the Bar v. Dineen*, 500 A.2d 262, 264 (Me.1985), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 696 (1986).

[¶ 8] We have held that "[t]he term 'client' includes one who is either 'rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him.'" *Board of Overseers of the Bar v. Dineen*, 500 A.2d 262, 264 (Me.1985) (citing M.R. Evid. 502(a)(1)). In *Dineen*, we further explained that "'[a]n attorney-client relationship does not require the payment of a fee or formal retainer but may be *implied from the conduct of the parties*.'" *Dineen*, 500 A.2d at 264–265 (quoting *Matter of McGlothlen*, 99 Wash.2d 515, 663 P.2d 1330, 1334 (1983)) (emphasis added).

■ [¶ 9] We adopt the New Hampshire formulation that an attorney-client relationship is created when "'(1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's

---

**2.** The complainant was embarrassed about having had three daughters with three differ-

ent men, only one of whom she had married.

professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.' " *State v. Gordon*, 141 N.H. 703, 692 A.2d 505, 506 (1997) (quoting *McCabe v. Arcidy*, 138 N.H. 20, 25, 635 A.2d 446, 449 (1993)).

[¶ 10] The record is replete with evidence to support the single justice's conclusion that there existed an attorney-client relationship between Mangan and the complainant. The complainant sought advice and assistance from Mangan. The advice or assistance sought pertained to matters within Mangan's competence and Mangan undertook the task requested of him.

[¶ 11] Given that definition of "attorney-client relationship," the single justice did not commit clear error in finding that Mangan and the complainant had entered into an attorney-client relationship.

[¶ 12] We next consider whether Mangan's actions constituted "the practice of law." The Maine Bar Rules do not explicitly state what constitutes the "practice of law," nor have we ever defined what constitutes the "practice of law."

[¶ 13] The term "practice of law" is a " 'term of art connoting much more than merely working with legally-related matters.' " *Attorney Grievance Commission of Maryland v. Shaw*, 354 Md. 636, 732 A.2d 876, 882 (1999) (quoting *In re Application of Mark W.*, 303 Md. 1, 491 A.2d 576, 585 (1985)). "The focus of the inquiry is, in fact, 'whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent.' " *Id.* (quoting *In re Discipio*, 163 Ill.2d 515, 206 Ill.Dec. 654, 645 N.E.2d 906, 910 (1994)). Even where " 'trial work is not involved but the preparation of legal documents, their interpretation, the giving of legal advice, or the application of legal principles to problems of any complexity, is involved, these activities are still the practice of law.' " *Shaw*, 732 A.2d at 883 (quoting *Lukas v. Bar Ass'n of Montgom-*

*ery County*, 35 Md.App. 442, 448, 371 A.2d 669, 673, *cert. denied*, 280 Md. 733 (1977)).

[¶ 14] In *Shaw*, 354 Md. 636, 732 A.2d 876, 882 (1999), the court noted that the practice of law includes " '[u]tilizing legal education, training, and experience [to apply] the special analysis of the profession to a client's problem.' " (quoting *Kennedy v. Bar Ass'n of Montgomery County, Inc.*, 316 Md. 646, 662, 561 A.2d 200, 208 (1989)). The *Shaw* court further noted that "[t]he Hallmark of the practicing lawyer is responsibility to clients regarding their affairs, whether as advisor, advocate, negotiator, as intermediary between clients, or as evaluator by examining a client's legal affairs." *Shaw*, 732 A.2d at 883 (quoting *In re Application of R.G.S.*, 312 Md. 626, 632, 541 A.2d 977, 980 (1988)).

[¶ 15] The single justice made the following finding in determining that Mangan's search for the girls' fathers constituted the practice of law:

As attorneys' roles increase in complexity and overlap with other professions, the answer to [the question of what constitutes the practice of law] will continue to evolve. Ultimately, the question will turn on the specific facts of the work undertaken and the understanding of the parties. In determining whether Mr. Mangan was engaged in the practice of law, I have looked to, among other things, the understandings of both [the complainant] and Mr. Mangan, the trust and confidence reposed in Mr. Mangan by [the complainant], the context in which the request for services arose-both physical and conceptual, the skills necessary to the completion of services, the need for discretion and confidentiality in rendering the services, and the nature of the services themselves.

[¶ 16] The determination of what constitutes the practice of law is very fact specific. In this instance, the record shows that the complainant approached Mangan in his law office, she sought Mangan's advice on the matter while she was there on other

attorney-client business, Mangan did not tell the complainant that he was not undertaking the search as her lawyer, the complainant had a reasonable belief that he was undertaking the search *as her attorney*, and she told him very personal and confidential information about her relationship with the girls' fathers. Because there is competent evidence in the record to support the single justice's findings, she did not commit clear error in holding that Mangan was engaged in the practice of law while searching for the girls' fathers.[3]

## B.

 [¶ 17] As the single justice noted, "no funds belonging to the lawyer or his law firm shall be deposited" in a client escrow account. *See* M. Bar R. 3.6(e)(1), (2). The single justice found as a matter of fact that Mangan placed his own funds in his client escrow account and, on the complainant's behalf, wrote a check to another attorney from that account. The single justice also found, and we agree, that the use of the client escrow account for this purpose constituted an unmistakable violation of M. Bar R. 3.6(e)(1)[4] and

was conduct unworthy of an attorney for the purposes of M. Bar R. 3.1(a).[5] An attorney may not, under any circumstances, mingle his funds with the funds belonging to his clients in the escrow account.

## C.

 [¶ 18] Both in his brief and at oral argument to us, Mangan argued extensively that he was denied a fair and impartial trial. We first note Mangan failed to make the arguments he makes on appeal before the single justice. An issue not raised before the single justice is deemed waived. *See McAfee v. Cole*, 637 A.2d 463, 467 (Me.1994) (Dana, J. dissenting) ("a party who raises an issue for the first time on appeal will be deemed to have waived the issue"). In the instant situation, Mangan's intemperate attacks on the single justice and Bar Counsel are further evidence of his unfitness for the practice of law. The record is devoid of any evidence to sustain Mangan's unfounded accusations. Although Mangan disputes many of the factual findings of the single justice, those findings are supported by the record

---

3. Mangan, interestingly enough, denies the existence of an attorney-client relationship; however, he also testified as follows:

 Q. Why is it that you didn't deposit [the $2,000] in your checking account or your savings account?

 A. The escrow account was clients' money.

 Q. But it wasn't her money?

 A. Sure it was, once I gave it to her, it was her money.

4. M. Bar R. 3.6 provides in pertinent part:

 **(e) Preserving Identity of Funds and Property.**

 (1) All funds of clients paid to a lawyer or law firm, other than retainers and advances for costs and expenses, shall be deposited in one or more identifiable accounts maintained in the state in which the law office is situated at a financial institution authorized to do business in such state. No funds belonging to the lawyer or law firm shall be deposited therein except as follows:

 (i) Funds reasonably sufficient to pay institutional service charges may be deposited therein; and

 (ii) Funds belonging in part to a client and in part presently or potentially to a lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client; in that event the disputed portion shall not be withdrawn until the dispute is finally resolved.

M. Bar R. 3.6(e)(1).

5. M. Bar R. 3.1 provides in relevant part:

 (a) This Code shall be binding upon attorneys as provided in Rule 1(a). Violation of these rules shall be deemed to constitute conduct "unworthy of an attorney" for purposes of 4 M.R.S.A. § 851 and Rule 7(e)(6)(A). Nothing in this Code is intended to limit or supersede any provision of law relating to the duties and obligations of attorneys or the consequences of a violation; and the prohibition of certain conduct in this Code is not to be interpreted as an approval of conduct not specifically mentioned.

M. Bar R. 3.1(a).

and would only be set aside if they were clearly erroneous, giving due regard to the opportunity of the single justice to evaluate the credibility of witnesses. It is clear that the single justice found much of Mangan's testimony not to be credible, a conclusion fully supported in the record.

[¶ 19] Mangan received a fair and impartial trial. He was represented by counsel;[6] he challenged the evidence offered by Bar Counsel; and obtained a favorable result on those counts on which Bar Counsel failed to sustain his burden of proof. The findings of the single justice are supported by the record and the sanction imposed was justified.

[¶ 20] Mangan's other contentions are meritless.

The entry is:

Judgment affirmed.

---

6. On appeal, Mangan appeared on his own behalf.