STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss.                             CIVIL ACTION
                                         DOCKET NO. CV-02-15


JADE ANGELICA,

            Plaintiff

      v.                                 ORDER ON DEFENDANT'S MOTION
                                             FOR SUMMARY JUDGMENT

DRUMMOND, WOODSUM &                      DONALD L. GARBRECHT
MACMAHON, P.A.,                               LAW LIBRARY

            Defendant                         SEP 30 2002


      This matter is before the court on (i) the motion of the defendant

Drummond, Woodsum & MacMahon, P.A. (DWM) for summary judgment, and

(ii) the motions of the plaintiff Jade Angelica to strike certain documents filed

by DWM and certain portions of DWM's statements of material facts (DSMF).

      The plaintiff alleges that John Kaminski, in his capacity as an attorney

and shareholder of DWM, negligently represented Jade Angelica and breached

his contractual obligations to her.  From this premise, the plaintiff's complaint

seeks damages against the DWM law firm for legal malpractice (Count I),

breach of contract (Count II), breach of fiduciary duty (Count III), fraud (Count

IV), negligent infliction of emotional distress (NIED) (Count V), intentional

infliction of emotional distress (IIED) (Count VI), and negligent supervision

(Count VII).  The allegation of negligent supervision in Count VII is the only

claim against DWM for its direct actions.  All of the other claims are based on

DWM's alleged vicarious liability for Kaminski's actions.  DMW denies that

there was an attorney-client relationship between Angelica and Kaminski, and denies that it is vicariously liable.

## A. Plaintiff's Motions to Strike

In reply to the plaintiff's opposition to the motion for summary judgment, DWM filed documents styled, "Defendant's Statement of Material Facts deemed Admitted for Failure to Properly Controvert in Accordance with Rule 56(h)(4) of Maine Rules of Civil Procedure" and "Statement of Facts Admitted by Plaintiff." Since these documents do not represent the stipulations of the parties, the court agrees with the plaintiff that they are superfluous and merely reargue the facts set forth in the DSMF. Accordingly, the plaintiff's motion to strike these documents is granted.

The plaintiff's motion to strike certain paragraphs of the DSMF because they do not include appropriate recorded citations is denied because it is unnecessary given the court's independent analysis of the parties' compliance with the requirements of Rule 56(h).[1]

## BACKGROUND

John Kaminski was an attorney and a shareholder of the DWM law firm. DWM had a policy that permitted attorneys in the firm to perform a certain amount of legal work for family members, spouses and significant others free of charge.

On April 13, 1996, Kaminski met Angelica. She was living in Cambridge, Massachusetts, and was receiving SSDI payments due to PTSD (childhood

---

[1] For example, the DSMF paragraphs that refer to or rely on the affidavit of John Kaminski are not supported by record citations because the affidavit was not filed with the court. Factual assertions and denials unsupported by record references, or supported by insufficient record references are not included in this recitation of the facts unless it is clearly indicated that a fact is disputed. M.R. Civ. P. 56(h).

2

sexual abuse) and chemical sensitivities. They began a romantic relationship sometime thereafter.

In the spring or summer of 1996, the couple discussed living together in Kaminski's house in Portland, which was listed for sale. The house was taken off the market and renovated to accommodate the couple's needs and Angelica's chemical sensitivities. Angelica never moved into the house. Kaminski sold it in the fall of 1997 and purchased a condominium in Old Orchard Beach (OOB). Later in 1997, the couple leased premises in Newton, Massachusetts. However, they terminated the lease because the premises needed extensive renovations and repairs. Kaminski paid the lease termination fee. Angelica continued to live in her Cambridge apartment.

In the winter of 1997, Angelica's landlord notified her that he was going to renovate the outside her apartment building.[2] Kaminski invited Angelica to use his OOB condominium while the renovations were being completed. Kaminski arranged to temporarily live elsewhere while Angelica resided at the condominium.

In May 1998, the couple leased an apartment in Portland for Angelica, but she did not move into the apartment. The lease was terminated and Kaminski paid a lease termination fee. In September 1998, they rented a house in Portland for her. They also discussed Angelica's permanent relocation to Maine and the possibility of buying a house together. To this end, they attempted without success to purchase two different properties.

---

[2] Angelica retained Massachusetts's counsel, without the assistance of Kaminski, to enjoin the renovation work based on her status as a disabled person. The renovations were temporarily postponed until better weather when she could open the windows to her apartment.

On September 15, 1998, the couple entered into an agreement, which required Kaminski to pay a portion of Angelica's then-existing housing costs and any replacement housing costs without regard to whether she and Kaminski ended their relationship (First Agreement). On October 27, 1998, they entered into another agreement, which provided that in the event their relationship ended, Kaminski would pay a portion of Angelica's housing costs and they would divide any jointly owned savings accounts and investments (Second Agreement).

In December 1998, Kaminski refinanced his OOB condo and transferred a 50% ownership interest to Angelica. In March 1999, Kaminski and Angelica became engaged. The following month, they purchased a home in Scarborough and made significant renovations, in part to accommodate Angelica's chemical sensitivities. Kaminski contributed the majority of the financing and down payment for the purchase. Angelica contributed $10,000 using funds withdrawn from her pension plan.

On July 23, 1999, the couple entered into a third agreement (Third Agreement). Among other things, the agreement provided for Kaminski's conditional assumption of certain financial obligations regarding the couple's Scarborough home and Angelica's housing needs, again, without regard to whether their relationship ended. That agreement was amended on October 3, 1999, to reduce the amount of Kaminski's share of the monthly housing expenses. In September 1999, Kaminski moved into the Scarborough home, and in November 1999, Angelica moved in.

In August 2000, Kaminski found a note written by Angelica to herself stating that she intended to end the relationship and "all that's left is to make

4

sure I am provided for." Their relationship ended the following month. At that time, Kaminski told Angelica that he would fulfill his financial commitments to her under their agreement.

On December 21, 2000, Kaminski discussed his personal financial situation with DWM president William Plouffe, Esq., and told Plouffe that he was contemplating bankruptcy. On February 11, 2001, Kaminski filed for Chapter 13 bankruptcy protection. Angelica was named as a debtor and she asserted tort and contract claims against Kaminski in that action. She eventually withdrew her tort claims.

On March 17, 2003, the Bankruptcy Court confirmed Kaminski's Chapter 13 plan. Angelica was awarded a judgment on her contract claim, which was determined to have a value of $779,036.12. Under the plan, she will receive approximately $76,000 over three years, which is about 90% of the total payout to be made to all of Kaminski's unsecured creditors.

## DISCUSSION

A motion for summary judgment will be granted if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. A material fact is one having the potential to affect the outcome of the suit. *Id.* The court views "the evidence together with all justifiable inferences in the light most favorable to the party opposing the motion." *Stewart v. Machias Savings Bank*, 2000 ME 207, ¶ 9, 762 A.2d 44, 46.

A.    Negligent Supervision

Angelica alleges that DWM is liable for the negligent supervision of its employee Kaminski. Although other jurisdictions have recognized the tort,

5

relying primarily on the *Restatement (Second) of Torts* § 317 (1965),[3] the Law

Court has declined to do so. *See Napieralski v. Unity Church of Greater*

*Portland*, 2002 ME 108, ¶¶ 6-9, 802 A.2d 391, 392-93 (citing jurisdictions that

have adopted § 317, but electing not to recognize the section); *see also Mahar v.*

*Stonewood Transp.*, 2003 ME 63, ¶ 10, 823 A.2d 540, 543; *Hinckley v.*

*Penobscot Valley Hosp.*, 2002 ME 70, ¶ 16, 794 A.2d 643, 647. The Law Court

appears to have declined to recognize the tort or adopt § 317 of the

*Restatement* because the facts of the cases presented to it, thus far, do not

support such a cause of action.

Even if Maine were to recognize the tort and adopt § 317 of the

*Restatement*, the record does not support such a claim against DWM. Aside

from the fact that there are disputed issues as to whether the conduct by

Kaminski of which Angelica complains occurred on DWM's premises or

whether DWM's resources were used, the alleged conduct primarily occurred

---

[3] The RESTATEMENT provides that

> A master is under a duty to exercise reasonable care so to control his
> servant while acting outside the scope of his employment as to prevent
> him from intentionally harming others or from so conducting himself as
> to create an unreasonable risk of bodily harm to them, if

> (a)    the servant

> (i) is upon the premises in possession of the master or upon which
> the servant is privileged to enter only as his servant, or

> (ii) is using a chattel of the master, and

> (b)    the master

> (i) knows or has reason to know that he has the ability to control
> his servant, and

> (ii) knows or should know of the necessity and opportunity for
> exercising such control.

*Restatment (Second) of Torts* § 317 (1965).

between Kaminski and Angelica in a private setting and in the context of their personal relationship. Although DWM knew it had the ability to control Kaminski's professional performance to some degree, it cannot be said on this record that DWM knew or should have known about Kaminski's conduct.[4] The court agrees with DWM's assertion that a different result "would suggest that employers should become the guarantors of their employee's good conduct in private matters merely because the initial contact with the employee occurred in the regular course of business." *Napieralski*, 2002 ME 108, ¶ 8, 802 A.2d at 393. Accordingly, DWM is entitled to summary judgment on Count VII of the complaint.

B.   Vicarious Liability

Angelica's remaining claims are premised on DWM's vicarious liability for the conduct of Kaminski. Vicarious liability is the imputation of liability upon one person for the actions of another. *See generally, Prosser & Keeton on Torts* Ch 12 (5th Ed.1984). An employer may be held vicariously liable without fault for the tortious conduct of his employee which is within the "scope of the employment." *Id.,* § 70 at 502; *Restatement (Second) of Agency* § 219(1) (1958). Many factors are considered in determining the kind of conduct included in "scope of employment." *See Restatement (Second) of Agency* at § 229. In general, the agent's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the employer. *See id.* at § 228. Whether an employee is acting

---

[4] Angelica asserts that DWM was aware of Kaminski's problems in the workplace and, as a result, had monitored and restricted his caseload. However, this awareness did not occur until Kaminski disclosed his intent to file for bankruptcy, well after his agreements with Angelica were executed. The monitoring and restrictions did not evolve until after this lawsuit was filed.

7

within the scope of his employment may be either a question of fact for the jury or a question of law for the court. *Stevens v. Frost*, 32 A.2d 164, 166 (Me. 1943). However, the question of "whether there is evidence to justify triers of fact to so find is for the Court, and if there be no such evidence, it is the duty of the Court to direct a verdict." *Id.*

The Law Court has not expressly adopted the *Restatement (Second) of Agency* § 228. However, relying on *McLain v. Training & Dev. Corp.*, 572 A.2d 494 (Me. 1990), the First Circuit has concluded that § 228 is the law in Maine. *See Nichols v. Land Transport Corp.*, 223 F.3d 21, 23 (1st Cir. 2000); *see also McLain*, 572 A.2d at 497 (finding the inclusion of a different provision of the *Restatement* to be harmless error, but not expressly deciding the issue of section 228 because the parties did not raise the question).

There is no real dispute that drafting agreements was among the type of work Kaminski was employed by DWM to perform. However, there is a fact issue as to whether Kaminski's conduct was, to any degree, performed to serve the purposes of DWM.[5] Employing the § 228 analysis on this record, there is a genuine issue of fact as to whether DWM is vicariously liable for Kaminski's conduct with respect to Angelica's claims of legal malpractice, breach of fiduciary duty and NIED.

## C.  Malpractice

Legal malpractice is the breach of the duty owed a client by her attorney. *See Butler v. Mooers*, 2001 ME 56, 771 A.2d 1034; *Johnson v. Carleton*, 2001 ME 12, 765 A.2d 571. Whether an attorney-client relationship exists is a

---

5 Angelica alleges 21 different instances in which DWM's agents, including Kaminski, provided legal services to her. *See* Pl.'s Answers to Interrogs. ¶ 21, attached to Aff. of Jade Angelica.

8

factual determination. *Bd. of Bar Overseers v. Mangan*, 2001 ME 7, ¶ 7, 763 A.2d 1189, 1192 (citing *Bd. of Bar Overseers v. Dineen*, 500 A.2d 262, 264 (Me. 1985)). There are disputed facts as to (1) whether the Kaminski-Angelica relationship was professional as well as personal; (2) whether "legal advice" was given to Angelica by Kaminski; (3) if so, whether Angelica reasonably relied on Kaminski's advice; (3) whether Kaminski breached a duty owed to Angelica as a client; and (5) if so, whether that breach was the proximate cause of harm to Angelica. Finally, there is also an issue as to whether Kaminski's negotiations and drafting of the agreements were "actuated, at least in part, by a purpose to serve" DWM. Based upon the foregoing, Angelica's malpractice claim in Count I survives the motion for summary judgment.

D.     Breach of Contract

Angelica asserts that the alleged breach by Kaminski of the Second and Third Agreements constitutes a breach of contract by DWM because Kaminski was acting within the scope of his agency. The existence of a contract is normally a question of fact. *Bates v. Anderson*, 614 A.2d 551, 552 (Me. 1992). In the instant case, the parties agree that the contracts were not between Angelica and DWM. Because no juror could reasonably find the existence of a contract between the parties to this litigation, Angelica's breach of contract claim in Count II may not lie as a matter of law. *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 9, 762 A.2d 44, 46. Furthermore, although the scope of one's agency is a jury question, the personal performance by an agent or employee of a personal contract regarding personal obligations is not within the scope of the agency or employment as a matter of law. Accordingly, DWM is entitled to summary judgment on Count II of the complaint.

E.    Breach of Fiduciary Duty

Angelica claims that DWM owed her a fiduciary duty and breached that duty by allowing Kaminski to draft unfair agreements that benefited him and injured her, and by failing to require Kaminski to properly compensate her under the terms of those agreements.

Under Maine law, the elements of a fiduciary relationship are "(1) the actual placing of trust or confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue." *Stewart*, 2000 ME 207, ¶ 10, 762 A.2d at 46 (quoting *Bryan R. v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 1999 ME 144, ¶ 19, 738 A.2d 839, 846). The Law Court has held that "[t]o demonstrate the necessary disparity of position and influence ... a party must demonstrate diminished emotional or physical capacity or . . . the letting down of all guards and bars." *Stewart*, 2000 ME 207 at ¶ 11, 762 A.2d at 46. "The existence of a confidential [or fiduciary] relationship remains a question of fact and need not be imposed by law." *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975).[6]

There is evidence on this record that Angelica was suffering from diminished emotional or physical capacity while she was dealing with Kaminski. Because there are material issues of fact regarding the nature of the Kaminski-Angelica relationship — personal or professional — and the degree to which Angelica placed trust in him, and because the court has already concluded that there is also an issue of fact as to whether DWM may be vicariously liable for Kaminski's conduct in this regard, Angelica's claim for

---

[6] However, Maine has recognized certain formal fiduciary relations. *Bryan R.* 1999 ME 144 at ¶ 19, 738 A.2d at 846 (listing business partners, families engaged in financial transactions, and corporate relationships)(citations omitted).

10

breach of fiduciary duty in Count III survives the motion for summary judgment.

F.  Fraud

Fraud requires proof by clear and convincing evidence that a person

(1) [made] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably [relied] upon the representation as true and [acted] upon it to his damage.

*Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979); *see also Brawn v. Oral Surgery Assocs.*, 2003 ME 11, ¶ 21, 819 A.2d 1014, 1026 (quoting *Harkness v. Fitzgerald*, 1997 ME 207, ¶ 6, 701 A.2d 370, 372). Clear and convincing evidence is evidence sufficient to "place in the ultimate factfinder an abiding conviction that the truth of [the plaintiff's] factual contentions are 'highly probable.'" *Taylor v. Comm'r of Mental Health & Mental Retardation*, 481 A.2d 139, 153 (Me. 1984) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

In her complaint, Angelica alleges that Kaminski knew that the agreements he prepared were unenforceable, that he falsely misrepresented that they were enforceable, and that DWM is vicariously liable for the misrepresentation. DWM asserts that it not liable because the agreements were enforceable and because Kaminski acted pursuant to his personal relationship with Angelica and not as an agent or employee of DWM.

A principal is not liable for harm caused by a servant or other agent acting outside the scope of his employment wholly for his own purposes. *Restatement (Second) of Agency* § 219(2). However, the *Restatement* identifies four exceptions to this rule. *Id.* at § 219 (2)(a)-(d). Of relevance to this case,

11

one of those exceptions provides that the employer is liable if the employee "purported to act or to speak on behalf of the [employer] and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship." Id. at § 219(2)(d). The Law Court has also determined that "[a]n employer is vicariously liable for the intentional torts of an employee if … the employment relationship 'made possible' the commission of the tort". *McClain*, 572 A.2d at 498.

Although the record evidence strongly suggests that the agreements and their predicate negotiations were strictly personal between Kaminski and Angelica and not related to the business of DWM, when considered in light of the foregoing factors, there is an issue as to whether Kaminski was acting within the scope of his employment as a matter of law. However, even if Kaminski was acting in an agency or employment capacity, there is no record evidence, much less clear and convincing evidence, beyond Angelica's uncorroborated beliefs, that the agreements were unenforceable or that Kaminski knew them to be unenforceable at the time they were created and, thus, there is no evidence that he made a misrepresentation to her.

Accordingly, DWM is entitled to summary judgment on Count IV of the complaint.

G. **IIED**

A claim for intentional infliction of emotional distress requires a showing that

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the

12

plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable person could be expected to endure it."

*Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22-23 (quoting *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 15, 711 A.2d 842, 847). The plaintiff bears the burden of coming forward with evidence of specific extreme and outrageous conduct. *See, e.g., Bryan R.* 1999 ME 144, ¶ 25, 738 A.2d at 847. More than inappropriate behavior is required. "[I]t is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery." *Champagne*, 1998 ME 87, ¶ 16, 711 A.2d at 847 (quoting *Colford v. Chubb Life Ins. Co. of Am.*, 687 A.2d 609, 616 (Me. 1996)). Because there is no evidence on this record that DWM intentionally or recklessly inflicted severe emotional distress upon Angelica, its liability must be predicated on a responsibility for Kaminski's conduct.

Angelica claims that Kaminski intentionally inflicted emotional distress upon her by telling her, after the termination of their relationship, that their agreements weren't legal, by inappropriately handling the disposition of their property, and by leaving her for another woman. Even assuming that Kaminski engaged in the conduct attributed to him, it cannot be said as a matter of law that it "was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community" or that it caused Angelica emotional distress "so severe that no reasonable [person] could be expected to endure it." *See Curtis v. Porter*, 2001 ME 158, ¶¶ 10-12, 784 A.2d at 22-23; *Harkness*, 1997 ME 207 ¶ 5, 701 A.2d at 372 (holding that if evidence offered in opposition to summary

13

judgment would not be sufficient to withstand a motion for judgment as a matter of law at trial, summary judgment should be granted).

Finally, in the context of Angelica's IIED claim, the specific "extreme and outrageous" conduct ascribed to Kaminski was not performed within the scope of his employment with DWM and was not made possible by that employment relationship. Accordingly, DWM is not vicariously liable for that conduct and it entitled to summary judgment on Angelica's IIED claim in Count VI.

H.    NIED Claims

A NIED claim is predicated upon a duty to act reasonably to avoid causing emotional harm to others, but that duty exists only where the claim is based on a theory of bystander recovery, or a special relationship between the defendant and the person harmed, or the commission of an independent tort. *Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d at 25-26 (citations omitted). Angelica claims to have suffered emotional trauma because the agreements were drafted by Kaminski in his capacity as her attorney and were unfair and unenforceable, and because DWM failed to intervene on her behalf. Although not specifically alleged, Angelica appears to rely on both the special relationship (attorney-client) and the independent tort (legal malpractice) grounds.

A claim based upon the commission of a separate tort "is usually subsumed in any award entered on the separate tort" because most tort claims allow recovery of compensatory damages based on psychic injury. *Id.*, 2001 ME 158, ¶ 20, 784 A.2d at 26 ("[A]lthough negligent infliction claims are now routinely added to complaints stating a cause of action in tort, this practice is rarely necessary unless the claim is made by a bystander or against one with a

14

special relationship to the plaintiff."). However, a NIED claim based on a special relationship is not dependent on any other liability claim and may be pleaded as an independent count.

Although there are no Maine cases directly addressing whether an attorney-client relationship constitutes a special relationship for the purposes of a NIED claim, the Law Court has recognized some special relationships. Among these is the physician-patient relationship. *Bryan R.*, 1999 ME 144, ¶ 31, 738 A.2d at 848 (citing *Bolton v. Caine*, 584 A.2d 615, 618 (Me. 1990)). In *Bolton*, the Court held that a physician's failure to provide critical information to his patient constituted a breach of duty to avoid emotional harm to a patient. *Bolton*, 584 A.2d at 618. The Court explained that a factfinder could find it foreseeable that a patient might suffer psychological harm as the result of her physician's breach of duty to inform her of critical information relevant to a potential life-threatening illness. *Id.*

The Court has also found a special relationship existed between a hospital and the family of a deceased. *Bryan R.*, 1999 ME 144, ¶ 31, 738 A.2d at 848 (citing *Gammon v. Osteopathic Hosp. of Me.*, 534 A.2d 1282 (Me. 1987)). In *Gammon*, the Court held that a hospital and a funeral home could be held liable for "negligently inflicted *severe* emotional distress"[7] where the plaintiff discovered a limb in a bag purported to contain his deceased father's personal effects. *Gammon*, 534 A.2d at 1285-86.

As in *Bolton*, the *Gammon* Court employed a foreseeability analysis and commented that "a jury could conclude that the hospital and the mortician reasonably should have foreseen that members of [the deceased's] family would

---

[7] The court limited its holding in this case to liability for *severe* emotional distress. *Gammon*, 534 A.2d at 1286, n9.

be vulnerable to emotional shock at finding a severed leg in what was supposed to be the decedent's personal effects." *Id.* at 1285. The Court also noted that the "evidence in the case would support a jury finding that either or both of the defendants failed to exercise reasonable care to prevent such an occurrence." *Id.* at 1286.

Finally, the Court has deemed the psychotherapist-patient relationship a special relationship. *Bryan R.,* 1999 ME 144, ¶ 31, 738 A.2d at 848 (citing *Rowe v. Bennett,* 514 A.2d 802, 807 (Me. 1986)). In *Rowe,* the Court discussed the unique nature of the psychotherapist-patient relationship in the context of negligent infliction of emotional distress cases.

> Given the fact that a therapist undertakes the treatment of a patient's mental problems and that the patient is encouraged to divulge his innermost thoughts, the patient is extremely vulnerable to mental harm if the therapist fails to adhere to the standards of care recognized by the profession. Any psychological harm that may result from such negligence is neither speculative nor easily feigned. Unlike evidence of mental distress occurring in other situations, objective proof if the existence of *vel non* of a psychological injury in these circumstances should not be difficult to obtain.

*Rowe,* 514 A.2d at 806-07.

In the same decision where the Court held that the relationships discussed above were special relationships, the Court refused to hold that a relationship between churches and their members is the type of special relationship that would give rise to a duty to avoid emotional harm. *Bryan R.* 1999 ME 144, ¶ 32, 738 A.2d at 849. The Court rationalized its decision by stating it could not recognize such a relationship "without inquiring into the ecclesiastical relationship whose components are not within the purview of the secular courts." *Id.* (citing *Swanson v. Roman Catholic Bishop of Portland,* 1997

16

ME 63, ¶ 7, 692 A.2d 441, 443). It is noteworthy that, unlike in *Bolton* and *Gammon*, the Court explicitly declined to apply a foreseeability analysis in *Bryan R.* to determine whether there was a duty to avoid emotional harm. *Bryan R.*, ME 144, ¶ 31, 738 A.2d at 848. By doing this, the Court appears to be saying that although the foreseeability analysis was used in *Bolton* and *Gammon* to determine whether a duty to avoid emotional harm existed, special relationships were also present in those cases. *See id.*

The attorney-client relationship is similar in nature to the psychotherapist-patient relationship in *Rowe*, a case that was not decided using a pure foreseeability analysis. Just like the patients in psychotherapist-patient relationships, the clients in attorney-client relationships are encouraged to put significant trust in their attorneys. Emotional distress is likely where a client has been misled or has failed to receive critical information.

This conclusion seems consistent with a recent Law Court opinion on attorney misconduct. *Bd. of Overseers of the Bar v. Mangan*, 2000 Me. LEXIS 223. In that case, the Court held that "[e]motional harm in the context of attorney discipline matters ordinarily accompanies the client's distress at learning that his or her rights have been compromised by the attorney's misconduct." *Id.* at *7 n.3. From this language, it may be inferred that there is a nexus between the duty to act in a manner not adverse to your client under M. Bar R. 3.4(b)(1) and the duty not to cause the client emotional harm.

Guidance may also be found in other jurisdictions. The Supreme Court of Iowa has held that special relationships arise out of situations involving "contractual services that carry with them deeply emotional responses in the

17

event of breach." *Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990). The Oregon Court of Appeals held that a patient-physician relationship constituted a special relationship where a plaintiff entrusted himself to the defendant physicians, relied on their professional competence and performance, gave them responsibility and control over the administration of his MRI procedure and effectively authorized them to exercise independent judgment on his behalf. *Curtis v. MRI Imaging Servs. II*, 941 P.2d 602, 609 (Or. App. 1997).

Drawing upon the foregoing rationale, it can be said that there are circumstances in which attorneys offer clients the type of contractual services that carry with them deeply emotional responses in the event of breach. Likewise, there are issues of fact in the present case as to whether Angelica entrusted herself to Kaminski, relied on his professional competence and performance, gave him responsibility and control over the administration of her legal affairs, and effectively authorized him to exercise independent judgment on her behalf.

Based on this analysis, this court concludes that an attorney-client relationship can constitute a special relationship for the purposes of recovery for negligent infliction of emotional distress. Accordingly, because Angelica has formulated her damage claim under the second and third of the *Curtis* NIED variations, her NIED claim in count V may stand alone even though her claim for malpractice (Count I) allows recovery for psychic injury.

I.    Punitive Damages

In order to recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with malice. *Gayer v. Bath Iron Works*, 687 A.2d 617, 622 (Me. 1996). Malice can be express or implied. *St.*

18

*Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 16, 818 A.2d 995, 1001 (citing *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985). Express malice exists when "the defendant's tortious conduct is motivated by ill will toward the plaintiff." *Id.* Implied malice arises when "deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id.* Implied malice, however, is not established "by the defendant's mere reckless disregard of the circumstances." *Id.*

There is no evidence here of malice, actual or implied, on the part of DWM. Further, the firm is not vicariously answerable for punitive damages because there is no evidence that it authorized Kaminski's conduct, or that DWM was reckless in employing Kaminski, or that DWM ratified or approved Kaminski's actions. *See Restatement (Second) of Agency*, § 217C. Accordingly, DWM is entitled to summary judgment on Angelica's claims for punitive damages.

The entry is:

Plaintiff's Motion to strike documents is GRANTED;

Plaintiff's Motion to strike portions of Defendant's Statement of Material Facts is DENIED;

Defendant's Motion for Summary Judgment is GRANTED as to Counts II, IV, VI VII, and the claims for punitive damages;

Defendant's Motion for Summary Judgment is DENIED as to Counts I, III and V.

Dated:   September 9, 2003

Justice, Superior Court

19

SUPERIOR COURT
CUMBERLAND, ss.
Docket No   PORSC-CV-2002-00015

Attorney for: JADE ANGELICA
THOMAS F HALLETT
THOMAS F HALLETT LAW OFFICES   PA
36 UNION WHARF
PO BOX 7508
PORTLAND ME 04112

**DOCKET RECORD**

vs
DRUMMOND, WOODSUM & MACMAHON - DEFENDANT

Attorney for: DRUMMOND, WOODSUM & MACMAHON
JEFFREY EDWARDS
PRETI FLAHERTY BELIVEAU PACHIOS & HALEY
ONE CITY CENTER
PO BOX 9546
PORTLAND ME 04112-9546

Filing Document: COMPLAINT                    Minor Case Type: OTHER NEGLIGENCE
Filing Date: 01/10/2002

## Docket Events:

01/10/2002 FILING DOCUMENT - COMPLAINT FILED ON 01/10/2002
           AND JURY CLAIM

01/10/2002 Party(s):  JADE ANGELICA
           ATTORNEY - RETAINED ENTERED ON 01/10/2002
           Plaintiff's Attorney: THOMAS F HALLETT

01/16/2002 Party(s):  JADE ANGELICA
           SUMMONS/SERVICE - ACK OF RECEIPT OF SUMM/COMP FILED ON 01/16/2002
           WITH ATTACHED NOTICE AND ACKNOWLEDGEMENT FOR SERVICE BY MAIL.

01/16/2002 Party(s):  DRUMMOND, WOODSUM & MACMAHON
           SUMMONS/SERVICE - ACK OF RECEIPT OF SUMM/COMP SERVED ON 01/10/2002
           UPON DRUMMOND WOODSUM & MACMAHON TO JEFFREY EDWARDS ESQ.

01/24/2002 Party(s):  JADE ANGELICA
           NOTE - OTHER CASE NOTE ENTERED ON 01/24/2002
           REVISED SUMMARY SHEET FILED.

01/31/2002 Party(s):  DRUMMOND, WOODSUM & MACMAHON
           RESPONSIVE PLEADING - ANSWER & AFFIRMATIVE DEFENSE FILED ON 01/30/2002

01/31/2002 Party(s):  DRUMMOND, WOODSUM & MACMAHON
           ATTORNEY - RETAINED ENTERED ON 01/30/2002
           Defendant's Attorney: JEFFREY EDWARDS

02/26/2002 ORDER - SCHEDULING ORDER ENTERED ON 02/26/2002
           THOMAS E HUMPHREY , JUSTICE
           DISCOVERY DEADLINE IS OCTOBER 28, 2002. (PARTIES TO SELECT ADR PROCESS AND NEUTRAL. COPIES
           MAILED TO JEFFREY EDWARDS AND THOMAS HALLETT, ESQS.