MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2016 ME 139
Docket:      BCD-15-470
Argued:      June 8, 2016
Decided:     September 1, 2016

Panel:       SAUFLEY, C.J., and ALEXANDER, <u>MEAD</u>, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

DAVID L. SAVELL

v.

MICHAEL A. DUDDY et al.

MEAD, J.

[¶1]  David L. Savell appeals from a summary judgment entered in the Business and Consumer Docket (Cumberland County, *Horton, J.*) in favor of attorney Michael A. Duddy and the law firm of Kelly, Remmel & Zimmerman on Savell's complaint alleging attorney malpractice and a breach of fiduciary duty.  On appeal, Savell contends that the court erred in concluding that he failed to adduce prima facie evidence of an attorney-client relationship between himself and Duddy.  We affirm the judgment.

I.  BACKGROUND

[¶2] Viewing the summary judgment record in the light most favorable to the nonprevailing party, the record contains the following facts.  *Estate of Smith v. Salvesen*, 2016 ME 100, ¶ 2, --- A.3d ---.  Savell was the chief executive

officer of Sunbury Primary Care, P.A. (SPC), a medical practice in Bangor with three shareholders: Drs. Michael B. Bruehl, Kenneth G. Simone, and Thomas D. Hayward (the doctors). Savell was also a manager of Sunbury Medical Properties, LLC (SMP), whose sole business was owning and managing the real estate where SPC was located. Michael A. Duddy is an attorney licensed to practice in the State of Maine and is associated with the Portland law firm of Kelly, Remmel & Zimmerman (KRZ).

[¶3] Savell had no ownership interest in SPC, but had a one-fourth "economic interest" in SMP. As a holder of an economic interest in SMP, Savell's status was essentially the same as "members" of SMP, with the principal difference being that Savell lacked the right to participate in the management of the company and lacked the right to vote. Like members, Savell's interest in SMP included an agreement by which he guaranteed payment of one-fourth of certain secured debts owed by SMP to a bank, on which the three doctors were also guarantors.

[¶4] From early February 2013 until mid-August 2013, Savell, on behalf of both SPC and SMP, and with the doctors' approval, negotiated with Eastern Maine Medical Center for the sale of the SPC practice and SMP's real estate (where SPC was located). On August 12, 2013, the shareholders of SPC and

members of SMP tentatively agreed to sell both entities to EMMC for a total purchase price of $4,600,000—$1,000,000 for the SPC practice and $3,600,000 for SMP's real estate. EMMC was represented by the Eaton Peabody law firm at all relevant times.

[¶5] After the tentative agreement was reached in mid-August, SMP and SPC retained the services of Duddy and the KRZ law firm to represent their interests in the transaction. Savell had less involvement in the negotiations after Duddy became involved, but continued to act in his capacity as CEO of SPC and manager of SMP throughout the remainder of the negotiations and closing.

[¶6] KRZ and SPC entered into an attorney/client relationship in 1999, and the firm, through Duddy, undertook legal representation of SMP as well in 2005. KRZ's representation of each entity was not detailed in any fee agreement or letter of representation, other than a letter dating back to 1999 when KRZ first started representing SPC. That letter, however, was limited to the six-month period following its transmittal, at which point the parties would then decide whether "to continue the retainer system, or use [their] experience by that point in time to enter into a fixed fee arrangement."

[¶7]  On September 13, 2013, EMMC, SPC, and SMP executed an Asset Purchase Agreement.  The agreement identified EMMC as "Buyer," and SPC and SMP as "Seller."  The three doctors signed the agreement as owners of the corporate entities, and Savell signed the agreement in his capacity as a manager of SMP.

[¶8]  On September 27, 2013, an Eaton Peabody attorney, on behalf of EMMC, informed Duddy that there were too many risks with the transaction and that EMMC sought further refinement of terms of the agreement if the acquisition were to go forward.  On October 1, 2013, the parties entered into an amended Asset Purchase Agreement.  The amended agreement made three central changes.  First, the closing was divided into two parts: (1) the sale of SMP's real estate, and (2) the sale of the SPC medical practice.  The sale of SMP's real estate took place on the day of execution of the amendment for a purchase price of $3,950,000, a $350,000 increase from the initial sale price; the sale of the practice, they agreed, would be deferred for about a month.  Second, although the sale price of the SMP real estate was increased, the amended agreement also provided for an unspecified reduction in the price of the SPC practice.  Third, the net proceeds from the sale of SMP's property would be held in escrow by Eaton Peabody to satisfy certain specified

anticipated debts or liabilities. Ultimately, after most of the debts were satisfied, including mortgages, legal fees, and pensions, the remaining balance held in escrow was about $387,530.

[¶9] Pursuant to SMP's Operating Agreement, SMP "shall be dissolved upon the occurrence of any of the following events[:] . . . the sale or other disposition of all or substantially all of the assets of the Company or the permanent cessation of the Company's business operations." SMP's only asset was the real estate where SPC was located, which was sold on October 1, 2013.

[¶10] Upon dissolution, SMP agents were required to "immediately proceed to wind up the affairs of the Company in accordance with the requirements of [the statutes] and other applicable law." (Alteration in original.) Upon the liquidation of assets and payments of company liabilities, SMP was to distribute the remaining assets to each member and economic interest owner "with respect to the cumulative amount of all accrued but unpaid pre-dissolution distributions."

[¶11] On October 9, 2013, Savell sent an email to Duddy saying, "I want my [$]187[,]402 paid directly to me, leaving only [$]216,154 to pay [SPC]

6

debts." (Fourth alteration in original.) Duddy did not respond. On October 11, 2013, Savell sent another email to Duddy, saying,

> Additionally, I would like to have my share of the net proceeds received and placed in escrow after [SMP's] closing. I am not sure what authority EMMC has to retain monies due an equal owner who is not part of [SPC] and definitely has not signed any personal guarantees for any outstanding [SPC] debt. Thank you for your anticipated cooperation.

Again, Duddy did not respond. On October 14, 2013, Savell sent a third email to Duddy, saying,

> Again, I am requesting that EMMC's legal council [*sic*] be made aware that $187,402 of [SMP's] remaining . . . escrow [funds] belongs to me as a private investor with no ownership or financial responsibility for [SPC]. I am requesting that I receive my minimum investment before the end of [the] business [day] on Friday[,] October 18, 2013. I appreciate your assistance. Please let me know if there is something I should do with respect to receiving my [SMP] funds.
>
> [¶12] On October 14, 2013, Duddy responded to Savell, saying,
>
> So, [a third party's] attorney is threatening action by the 17th, you are making demands by the 18th, and we are trying to get to closing on the 23rd. Good grief. I am out of the office today and will call you tomorrow.

The same day, Duddy forwarded his email exchange with Savell to the three doctors, saying,

> Gentlemen, please see the below email exchange with [Savell]. I need to talk with you about the arrangements you may have made with [Savell], and how you want to handle his expectation.

[¶13]   Savell alleges that on October 23, 2013, one day before the scheduled closing for the sale of the SPC practice, Duddy called Savell and told him that the sale price of SPC was reduced to $400,000—a price equivalent to the practice's outstanding liabilities.   When Savell reminded Duddy that he was owed around $200,000 from the sale of SMP, Duddy responded, "[T]he only thing that matters right now is that this deal get done. . . . We'll deal with your issue later."

[¶14]  At the closing for the sale of the SPC practice the next day, Savell signed, in his capacity as CEO of SPC, an authorization and second amendment to the Asset Purchase Agreement, resulting in about $372,774 being applied to SPC's liabilities and leaving a remaining balance of $14,756.

[¶15]   On May 1, 2014, Savell filed a complaint in the Superior Court (Penobscot County) against the three doctors, Duddy, and KRZ, and the case was accepted for transfer to the Business and Consumer Docket.   On August 28, 2014, Savell filed a nine-count, third amended complaint.  Savell's claims against Duddy and KRZ were founded upon his assertion that an attorney-client relationship existed between himself and Duddy.

[¶16]  In November 2014, Savell filed a motion for summary judgment. On December 12, 2014, the doctors jointly filed a cross-motion for summary

judgment, and on December 15, 2014, Duddy and KRZ also filed a cross-motion for summary judgment. After a hearing, the court granted Duddy and KRZ's motion for summary judgment, concluding that Savell failed to demonstrate an attorney-client relationship between himself and Duddy.

[¶17] On February 27, 2015, the court granted in part and denied in part the three doctors' joint motion. The doctors and Savell eventually settled the remaining claims, resulting in a final judgment. Upon the entry of a final judgment, Savell timely appealed the earlier order granting Duddy and KRZ's motion for summary judgment. Savell's argument on appeal is limited to the entry of a summary judgment as to Count IX, alleging attorney malpractice and a breach of fiduciary duty by Duddy on behalf of KRZ.

## II. DISCUSSION

[¶18] "We review the grant of a motion for summary judgment de novo, and consider both the evidence and any reasonable inferences that the evidence produces in the light most favorable to the party against whom the summary judgment has been granted in order to determine if there is a genuine issue of material fact." *Budge v. Town of Millinocket*, 2012 ME 122, ¶ 12, 55 A.3d 484 (quotation marks omitted). A party seeking to avoid summary judgment must adduce prima facie evidence as to each element of a

claim or defense that the party asserts. *See Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 9, 868 A.2d 220.

[¶19]  "A fact is material if it has the potential to affect the outcome of the suit, and a genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive."  *Angell v. Hallee*, 2014 ME 72, ¶ 17, 92 A.3d 1154 (quotation marks omitted).  "When the material facts are not in dispute, we review de novo the trial court's interpretation and application of the relevant statutes and legal concepts."  *Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 19, 116 A.3d 466.

[¶20]  Count IX of the complaint, the only count at issue in this appeal, alleges attorney malpractice and a breach of a fiduciary duty.  The threshold issue to each of these claims is whether an attorney-client relationship existed between Savell and Duddy.  *See Estate of Cabatit v. Canders*, 2014 ME 133, ¶ 21, 105 A.3d 439 ("[T]he general rule is that an attorney owes a duty of care to only his or her client.").

[¶21]  "[A]n attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and

(3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *Bd. of Overseers of the Bar v. Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189 (quotation marks omitted). The existence of an attorney-client relationship is a question of fact. *Id.* ¶ 7. "The term 'client' includes one who is either rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him." *Bd. of Overseers of the Bar v. Dineen*, 500 A.2d 262, 264 (Me. 1985) (quotation marks omitted). "[A]n attorney-client relationship does not require the payment of a fee or formal retainer but may be implied from the conduct of the parties." *Id.* at 264-65 (quotation marks omitted).

[¶22] The court found that Savell failed to adduce evidence that he had "sought legal advice or assistance" from Duddy, thereby failing to satisfy the first prong of the *Mangan* test. *Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189; *see also Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 26, 133 A.3d 1021 ("The nonmoving plaintiff . . . must make out a prima facie case for its claim."). Savell argues on appeal, as he did in the trial court, that the series of email exchanges between himself and Duddy amounted to prima facie evidence of an attorney-client relationship.

[¶23]  Savell contends that the first prong of the *Mangan* test is satisfied because "[i]n every email [he] reiterated to Duddy his request for payment" and therefore he "repeatedly asked Duddy for assistance."  The summary judgment record shows that Savell indeed made various requests and demands of Duddy.  For instance, in his October 9 email to Duddy, Savell made the demand, "I want my [$]187[,]402 paid directly to me"; Savell's October 11 email states, "I would like to have my share of the net proceeds received and placed in escrow after [SMP's] closing. . . . Thank you for your anticipated cooperation"; and Savell's October 14 email tells Duddy that he is "requesting that EMMC's legal [counsel] be made aware" that he wanted the money placed in escrow.

[¶24]  Contrary to Savell's contention, however, the uncontroverted email exchanges show that Savell did not seek legal advice or assistance from Duddy.  As opposed to asking questions of or voicing concerns to Duddy in an effort to seek legal advice or assistance, Savell simply sought to use Duddy as a vehicle, in his capacity as an attorney for SMP and SPC, to relay his conviction that certain escrowed funds were due him.  Requests or demands that an attorney obtain his client's acknowledgement of a claim for monies owed by the client to the claimant do not by themselves constitute the seeking of legal

assistance within the purview of *Mangan*, and do not give rise to an attorney-client relationship.

[¶25] Several aspects of the parties' conduct and communications also strongly suggest that neither understood that an attorney-client relationship had been established between them. *See Dineen*, 500 A.2d at 264-65 ("[A]n attorney-client relationship . . . may be implied from the conduct of the parties." (quotation marks omitted)). First, Savell ended his October 11 email to Duddy with the closing "[t]hank you for your anticipated cooperation"— language unlikely to be used when an attorney has been engaged to pursue a client's specific objectives. Second, after Savell's email on October 14, Duddy forwarded Savell's emails to the three doctors and stated, "I need to talk with you about . . . how you want to handle [Savell's] expectation." Consulting with the majority shareholders of his corporate clients regarding their expectations about claims against corporate assets is strongly indicative of the fact that Duddy did not enter into an attorney-client relationship with Savell. On the contrary, it is distinctly more indicative of the fact that an adverse relationship existed between Savell and Duddy's corporate clients—a circumstance that would prevent Duddy from entering into an attorney-client relationship with Savell. Third, Duddy explicitly deferred addressing Savell's demands by

saying things like "we'll deal with your issue later" and "we'll ultimately get to your situation."[1]  As the court observed, this is "not something an attorney would tell his own client" and similarly, from Savell's perspective, "it is hard to believe [that Savell] would have allowed his own attorney to defer dealing with his concerns until later."

[¶26]  The court, therefore, properly concluded that Savell failed to adduce prima facie evidence that he sought legal advice or assistance from Duddy based on the emails and the parties' conduct.

[¶27]  Notwithstanding its finding that Savell failed to satisfy the first prong of the *Mangan* test, the court also found that Savell failed to demonstrate that Duddy expressly or impliedly agreed to give or actually gave legal advice.[2]  *See Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189.

[¶28]  We need not reach that finding, however, because satisfaction of the first prong of the *Mangan* test—seeking legal advice or assistance from an attorney—is a threshold issue to both the second and third elements of the test.  The plain language of the *Mangan* test makes this clear, stating, "(2) *the*

---

[1] For reasons discussed below we do not address whether these responses constitute an implicit agreement to render legal advice or assistance.  *See infra* ¶¶ 27-28.

[2] With regard to the second element of the *Mangan* test, there is no contention that any of the matters were outside the scope of Duddy's professional competence.  *See Bd. of Overseers of the Bar v. Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189.

*advice or assistance sought* pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives *the desired advice or assistance.*"  *Id.* (emphases added) (quotation marks omitted).  Thus, because Savell did not seek legal advice or assistance, the second and third prongs of the *Mangan* test necessarily cannot be satisfied.

[¶29]  Savell argues, in the alternative, that even if he was not Duddy's client, Duddy owed him a duty as a nonclient based on the multifactor third-party beneficiary test that we adopted in *Canders*, 2014 ME 133, ¶ 16, 105 A.3d 439.  The multifactor balancing test involves analysis of the following six favors: "(1) the extent to which the transaction was intended to benefit the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the policy of preventing future harm; and (6) the extent to which the profession would be unduly burdened by a finding of liability."  *Trask v. Butler*, 872 P.2d 1080, 1084 (Wash. 1994); *see also Canders*, 2014 ME 133, ¶ 16, 105 A.3d 439 (adopting the multifactor third-party beneficiary test created by the *Trask* court).

[¶30]  Savell's argument that Duddy owed him a duty of care as a nonclient is unpersuasive.  In *Canders*, we explained that "[a]n attorney will never owe a duty of care to a nonclient . . . if that duty would conflict with the attorney's obligations to his or her clients."  *Canders*, 2014 ME 133, ¶ 21, 105 A.3d 439; *see also Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 11, 54 A.3d 710 ("[T]he court will not impose a duty of reasonable care on an attorney if such an independent duty would potentially conflict with the duty the attorney owes to his or her client." (quotation marks omitted)).  Savell's interest "as a private investor with no ownership or financial responsibility for [SPC]," as he acknowledges in his October 14 email, puts his interests in conflict with at least one of the business entities.  Indeed, in his brief Savell highlights the likelihood of a conflict among the parties because "the two companies did not have the same owners; the three doctors were [the] sole owners of SPC, but they owned only a [three-fourths] interest in SMP and Savell owned the other one-fourth."  In that light, Savell alleges that "[u]nder the [c]ircumstances[] a [c]onflict of [i]nterest [w]as [u]navoidable."  Because Savell notes in his statement of material facts that Duddy represented SPC and SMP, and because Duddy's representation of Savell individually would have

given rise to a conflict of interest with Duddy's other clients, Duddy could not have owed Savell a duty of care as a nonclient.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Barry K. Mills, Esq., Hale & Hamlin, LLC, Ellsworth, for appellant David L. Savell

James M. Bowie, Esq., and Hillary J. Bouchard, Esq., Thompson & Bowie, LLP, Portland, for appellees Michael A. Duddy and Kelly, Remmel & Zimmerman

**At oral argument:**

Barry K. Mills, Esq., for appellant David L. Savell

James M. Bowie, Esq., for appellees Michael A. Duddy and Kelly, Remmel & Zimmerman

Business and Consumer Docket docket number CV-2014-34
FOR CLERK REFERENCE ONLY