ENTERED AUG 2 7 2014

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
LOCATION: Portland
Docket No. BCD-CV-13-03

MMM-CUM-06-06-14

EARL HOLDSWORTH and
SANDRA HOLDSWORTH,

         Plaintiff,

v.

BERNSTEIN, SHUR, SAWYER &
NELSON, P.A.,

         Defendant.

**ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Defendant Bernstein, Shur, Sawyer & Nelson ("BSSN") moves for summary judgment on the one and only Count of Plaintiffs Earl and Sandra Holdsworths' Complaint. The Holdsworths allege four claims against BSSN stemming from BSSN's representation of David Higgins and Linda S. Rivard in negotiating the terms of a proposed easement. In particular, the Holdsworths' allege that BSSN's representation of Higgins and Rivard constituted: 1) an adverse relationship against an existing client; 2) representation against a former client without first obtaining that client's informed written consent; 3) dual representation of both sides regarding easement issues which were or could have been inherently adverse or conflicted as between the parties; and 4) interference with Plaintiffs' existing contractual relations and/or prospective economic advantage.

The Court held oral argument on Defendant's Motion for Summary Judgment ("MSJ") on May 12, 2014. For the reasons discussed below, the Court grants Defendant's MSJ on all claims.

## BACKGROUND

In 1969, Plaintiffs purchased a house and 35 acres of land at 111 Bruce Hill Road in Cumberland, Maine (the "Cumberland House" on the "Cumberland Property"). (Defendant's Statement of Undisputed Material Fact ("Def.'s S.M.F."), ¶ 3.) BSSN did not represent or advise Plaintiffs in their purchase of the Cumberland Property. (*See id.* at ¶ 22.) BSSN did, however, represent Dr. Earl Holdsworth in 1968 or 1969 regarding his dental partnership with another doctor. (*Id.* at ¶ 4.) Thereafter, BSSN proceeded to represent Dr. Holdsworth, primarily through Attorney Jerry Goldberg, on a number of matters in the 1970s and 80s. (*Id.* at ¶ 5.) While the majority of these matters related to Dr. Holdsworth's dental practice, in 1972, Attorney Goldberg drafted reciprocal wills and a trust for the Holdsworths. (*Id.* at ¶¶ 5, 6.)

After Attorney Goldberg left the practice of law in 1986, BSSN's relationship with the Holdsworths dwindled. (*See id.* at ¶ 6.) In the early 1980s, BSSN formed Fundy Road Associations, a partnership that owned a building in Falmouth, Maine consisting of four dentist's offices, one of which was used by Dr. Holdsworth. (*Id.* at ¶ 7.) In 1987, BSSN formed a non-profit corporation called Fundy Road Condominium Association. (*Id.*) Subsequently BSSN performed the legal work necessary to convert the Fundy Road building into a condominium and, in December 1993, to convey the four offices as condominium units. (*Id.* at ¶ 8.) After 1994, BSSN did not represent or advise the Holdsworths on any matter until the sale of Dr. Holdsworth's dental practice in 2003-2005. (*Id.* at ¶ 21.)

In 1987 or 1988, the Holdsworths began using Attorney Gary Vogel, a non-BSSN attorney, for a number of legal services including, but not limited to: 1) the purchase and financing of an office condominium; 2) a junior mortgage on the Cumberland Property to

2

securing financing for an office condominium; 3) a real estate matter regarding Dr. Holdsworth's Portland office; and 4) certain matters involving investment properties. (*Id.* at ¶ 12.) Attorney Vogel represented the Holdsworths until 1994, when the Holdsworths moved their legal work to the law firm of Van Meer & Belanger. (*See id.* at ¶ 14.)

The law firm of Van Meer & Belanger began representing Dr. Holdsworth in 1989, primarily with respect to business and corporate matters involving his dental practice. (*Id.* at ¶ 15.) On May 11, 1994, Attorney Thomas Van Meer, a non-BSSN attorney, became the clerk of Dr. Holdsworth's professional corporation and held that office until February 4, 2004. (*Id.* at ¶ 16.) By 1994, Van Meer & Belanger were also representing the Holdsworths concerning various personal matters including, but not limited to: 1) refinancing of the Cumberland Property and their commercial property; and 2) estate planning, culminating in the preparation and execution by the Holdsworths of Revocable Living Trust Agreements, Last Wills and Testaments, Powers of Attorney, and Health Care Powers of Attorney in August 1995. (*Id.* at ¶ 17.) Van Meer & Belanger have not rendered any legal services for the Holdsworths since the sale of Dr. Holdsworth's dental practice in 2005. (*Id.* at ¶ 18.)

In 2002, Dr. Holdsworth began taking steps to sell his dental practice. (*Id.* at ¶ 19.) He first retained Attorney Zeigler, a non-BSSN attorney, to draft an agreement for the sale of his practice to Dr. Yu. (*Id.*) Dr. Holdsworth then took that agreement to Attorney Eric Saunders at BSSN in 2003 and retained him to complete the sale. (*Id.*) In 2003, Dr. Yu purchased 50% of the stock in Dr. Holdsworth's professional corporation. (*Id.*) Dr. Yu then practiced with Dr. Holdsworth for two years before purchasing the remaining 50% of stock. (*Id.*) The sale closed with Dr. Yu's second stock purchase in October 2005 after which, Dr. Holdsworth retired. (*Id.*)

3

Beginning on February 4, 2004, Attorney Saunders succeeded Attorney Van Meer as Clerk of Dr. Holdsworth's professional corporation. (*Id.* at ¶ 20.) Attorney Saunders resigned that position on October 14, 2005 and was replaced as Clerk at Dr. Yu's request by her own, non-BSSN attorney. (*Id.*) After November 2005, BSSN did not perform any legal work for the Holdsworths and never sent the Holdsworths a bill for legal services rendered after that date.[1] (*Id.*) Although denied by BSSN, Dr. Holdsworth asserts that Attorney Saunders—through conversations with Dr. Holdsworth and/or Dr. Holdsworth and Timothy Hepburn, the Holdsworths CPA and financial advisor—"from time to time understood the importance of my maximizing the income that I would receive from the sale of my property in terms of my overall retirement plan." (Affidavit of Dr. Earl Holdsworth ("Dr. Holdsworth Aff."), ¶ 5.) Based in part on these conversations, Dr. Holdsworth believed he was a current client of BSSN through January 2007. (Plaintiffs' Statement of Additional Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s A.S.M.F"), ¶ 3.)

In the summer of 2006, the Holdsworths listed the Cumberland Property for sale at an asking price of $1,200,000. (Def.'s S.M.F., ¶ 28.) On August 6, 2006, John and Mary Jo Cashman signed a full price offer to buy the Cumberland Property for $1,200,000, subject to the results of the usual inspections. (*Id.* at ¶ 29.) The Holdsworths accepted the offer on August 9, 2006. (*Id.*) Shortly thereafter, the Cashmans learned that the driveway leading to the Cumberland House was shared with the abutting landowners, Higgins and Rivard. (*Id.* at ¶ 30.) On August 26, 2006, the Cashmans' broker drew up an Addendum to the Purchase & Sale

---

[1] Plaintiffs note that in 2007, Attorney Saunders processed documentation for Dr. Holdsworth in relation to a bank loan, but do not contend this constituted legal representation. (Plaintiffs' Statement of Fact in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s O.S.M.F") ¶ 32; Deposition Transcript of Plaintiffs' expert witness Attorney Phillip Johnson ("Johnson dep."), 124/24-125/19; *see generally* Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp. Brief").

4

Agreement, which addressed three issues the Cashmans had discovered during the inspection including the issue of the shared driveway. (*Id.* at ¶ 31.) As to the driveway, the Addendum to the Purchase & Sale Agreement gave the Holdsworths their choice of obtaining an easement from Higgins and Rivard or moving the driveway so that it was entirely on their property. (*Id.*)

In the hope that an easement might be obtained from Higgins and Rivard at no cost, the Cashmans decided to explore the possibility of obtaining an easement. (*Id.* at ¶ 32.) Later that summer, Dr. Holdsworth obtained an estimate that it would cost $20,000 to build a new driveway on the Cumberland Property. (*Id.* at ¶ 33.) At that time, the Holdsworths were prepared to build the other driveway to consummate the sale. (*Id.* at ¶ 34.) On September 19 and 21, 2006, respectively, the Cashmans and Holdsworths signed another Addendum, reducing the purchase price to $1,100,000 and requiring that Higgins and Rivard sign an easement deed with respect to the driveway that had been drafted by the Cashmans' lawyer. (*Id.* at ¶ 35.)

On October 18, 2006, Higgins received a faxed copy of the Cashmans' proposed easement deed from the Holdsworth's real estate broker, David Banks. (*Id.* at ¶ 38.) Higgins and Rivard did not want to obstruct or "mess up" the Holdsworths' sale to the Cashmans, but were apprehensive about signing the proposed easement and wanted to make sure their interests were protected. (*Id.* at ¶ 39; Transcript of Attorney Van Hemel Deposition ("Van Hemel dep."), 245/10-14.) Higgins was already a client of BSSN regarding other matters, and decided to contact Attorney Arnold MacDonald at BSSN to review the proposed easement and provide legal advice. (Def.'s S.M.F., ¶ 40.) After talking to Higgins, BSSN ran a conflict check for the proposed representation of Higgins and Rivard regarding the easement (the "easement negotiations") in which Dr. Holdsworth was listed as an adverse party. (*Id.* at ¶ 40; Affidavit of Michael L. Rair ("Rair Aff."), Exh. 2.)

On the same day BSSN ran its conflict check for the easement negotiations, Attorney MacDonald initiated a string of emails with Attorney Saunders and fellow BSSN shareholder Attorney Peter Van Hemel. (Transcript of Attorney Saunders Deposition ("Saunders dep."), Exh. 4.) The string of emails bore the subject "Earl Holdsworth" and read:

> Client who abuts Earl Holdsworth came in today to ask us to look at an easement. Earl's driveway crosses my client's property and my client wants to give permission to Earl and his successors to continue to use it for single family residential use. This is to facilitate Earl's sale of the property?
>
> Conflict? Can we get a waiver? I understand Earl's sale is coming up soon.

(*Id.*) Attorney Saunders responded to this email stating, "I'm sure we can get a waiver[,]" to which Attorney MacDonald responded, "Can you call?" (*Id.*) Attorney Saunders then called Dr. Holdsworth, but was unable to reach him and instead left a message requesting a call back. (*Id.*) Attorney Saunders communicated this to Attorney MacDonald. (*Id.*)

On November 1, 2006, Attorney MacDonald emailed Higgins explaining, in pertinent part, that:

> [A] conflict showed up in our system. We represented Dr. Holdsworth in connection with his sale of his practice. To be conservative we have asked him to waive any possible conflict of interest in connection with our representation of you.
>
> I suspect he is travelling. I have asked the realtor, as the person most motivated to collect the waiver, to contact Dr. Holdsworth. The realtor has not heard back from him, although he has been trying since the end of last week.
>
> Peter [Van Hemel] is confident that he will be able to prepare your document very quickly, but we need to make sure that the conflict is waived before we proceed. If you run into Dr. Holdsworth, please let him know that we are just waiting to hear from him."

(Rair Aff., Exh. 1.) Dr. Holdsworth returned Attorney Saunders call on November 20, 2006. (Def.'s S.M.F., ¶ 41.) The conversation between Attorney Saunders and Dr. Holdsworth was brief, and did not last more than approximately 15 seconds. (Pl.'s A.S.M.F., ¶ 10; Pl.'s

6

O.S.M.F., ¶ 41.) Dr. Holdsworth does not recall the conversation, but both Parties agree that Dr. Holdsworth did not object to Attorney Saunders reviewing the Easement Deed. (Pl.'s A.S.M.F, ¶ 10; Def.'s S.M.F., ¶41.) Later that day, Attorney Saunders notified Attorney MacDonald by e-mail that Dr. Holdsworth had consented to BSSN drafting the easement for Higgins. (Def.'s S.M.F., ¶ 42.)

Following Dr. Holdsworth's call with Attorney Saunders, Attorney Van Hemel drafted a counterproposal to the easement deed faxed to Higgins and Rivard. (Def.'s S.M.F., ¶ 43.) The counterproposal contained additional requirements which addressed Higgins and Rivard's three major concerns: 1) no increased use of the driveway; 2) maintenance of the driveway to be performed by the buyers; and 3) protection against liability due to any accident involving the driveway. (Id.) Attorney Van Hemel anticipated a smooth negotiation because the deal was a "fairly simple easement negotiation between two neighbors." (Pl.'s A.S.M.F., ¶ 13.) Attorney Jeffrey Selser, a non-BSSN lawyer retained by Dr. Holdsworth in late 2007 testified that Attorney Van Hemel stated his counterproposal was "over the top" and "excessive" and that if Attorney Van Hemel were in Attorney Selser's shoes, he "would not advise his clients to accept and sign the easement." (Affidavit of Attorney Selser ("Selser Aff."), ¶ 6.) Attorney Van Hemel explained that he had prepared the document as part of a negotiation strategy. (Id.)

Upon reading the counterproposal, Mary Jo Cashman felt it was "insane" and "insulting because it took control of all of the Higgins' [sic] property and what could be done with it...." (Transcript of Mary Jo Cashman Deposition ("Mary Jo Cashman dep."), 30/20-25, 321-9.) Not wanting to enter into extended negotiations over the easement, the Cashmans through counsel advised Attorney Van Hemel that they wanted Higgins and Rivard to sign the original easement deed with the inclusion of one change addressing respective liability for entry upon one another's

7

property. (Def.'s S.M.F., ¶ 44.) Higgins and Rivard declined the Cashmans' counteroffer and testified that they would have made the same decision regardless of who represented them. (*Id.* at ¶ 45.) Higgins and Rivard explained that they were wary of signing any easement deed at all. (*Id.*) Plaintiff's expert witness, Attorney Johnson, however, opined that a different attorney could have successfully negotiated an easement between the couples. (Johnson dep., 211/11-212/11.)

In January 2007, Dr. Holdsworth called Attorney Saunders regarding the easement negotiations. (Def.'s S.M.F., ¶ 46.) Dr. Holdsworth was very angry and upset during the conversation and blamed the lawyers for obstructing the sale. (Pl.'s O.S.M.F., ¶ 15.) During the conversation, Attorney Saunders informed Dr. Holdsworth that BSSN could not represent him in the easement negotiations because BSSN was representing Higgins and Rivard. (Def.'s S.M.F., ¶ 46.) Dr. Holdsworth was left "speechless" by Attorney Saunders' refusal to help him regarding the easement negotiations and referral to non-BSSN Attorney Terry Snow. (Pl.'s O.S.M.F., ¶ 15; Def.'s S.M.F., ¶ 46.)

On February 9, 2007, the Cashmans sent the Holdsworths a letter thanking them for their efforts in closing the sale, but withdrawing their offer to purchase the Cumberland Property. (February 9, 2007 Letter from the Cashmans to Holdsworths.) The Cashmans explained that they withdrew due to their inability to resolve the easement language presented by Higgins. (*Id.*) In particular, "they were taken aback by the severe terms of the Higgins proposal" and decided to investigate earlier titles for mention of a historical easement that would have provided them the access they believed the Holdsworths had enjoyed. (*Id.*) This search led them to discover that the boundary survey laying out the lines for the Cumberland Property may have contained an error. (*Id.*) The Cashmans believed that the driveway might be entirely on the Holdsworths'

8

property. (*Id.*) After laying out their search, the Cashmans raised the concern that the easement issue would encumber the Cumberland Property forever. (*Id.*) The Cashmans explained that they also withdrew from the sale because they were concerned Higgins would resent their presence after the tensions the easement issue had provoked. (*Id.*)

Nevertheless, the Cashmans signed a new Purchase & Sale Agreement and Addendum on February 23, 2007, offering to buy the Cumberland Property for $1,000,000. (Def.'s S.M.F., ¶ 49.) The new offer required the Holdsworths to build a new driveway that was indisputably on the Holdsworths' land and install underground utility lines to the House. (*Id.*) Plaintiffs contend the February 23, 2007 Offer also required them to essentially convey a portion of their property to Higgins even though there was no proof the land definitively belonged to Higgins. (Pl.'s A.S.M.F., ¶ 17.) Sandra Holdsworth did not find out about the February 23, 2007 offer until her deposition on June 11, 2013. (Def.'s S.M.F., ¶ 52.) Dr. Holdsworth states that he did not recall seeing or being told about the February 23, 2007 offer, but noted at his deposition that he did recall the portion of the offer requiring the Holdsworths to bury the utility lines to their house. (Pl.'s A.S.M.F., ¶ 17; Transcript of Dr. Earl Holdsworth Deposition from June 11, 2013 ("Dr. Holdsworth dep."), 176/18-20.) Based on the fact that his "dad was part of the telephone company down in Connecticut" and that he is a "do-it-yourself" type of person, Dr. Holdsworth estimated burying the utility lines would cost $100,000. (*Id.* at 177/7-178/21.) His belief that the Cashmans wanted them to spend another $100,000 angered Dr. Holdsworth who felt the Cashmans were "nickel and diming" him. (*Id.* at 180/3-181/3.) Dr. Holdsworth rejected the February 23, 2007 offer by not responding to it. (Def.'s S.M.F., ¶ 51.)

On February 27, 2008, the Holdsworths conveyed the Cumberland Property by quitclaim deed to their adult children to take advantage of a tax exemption. (*Id.* at ¶ 55; Pl.'s O.S.M.F., ¶

9

55.) The Holdsworths' children took out a $950,000 promissory note and a mortgage for the Cumberland Property. (Def.'s S.M.F., ¶ 56.) On April 9, 10, and 12, 2011, the Holdsworths' children signed a warranty deed conveying the Cumberland Property to Gregory and Joanne Fryer for $749,000. (*Id.* at ¶ 68.)

Meanwhile, the Holdsworths continued to engage in discussions with Higgins and Rivard regarding the boundaries of their property. (Pl.'s A.S.M.F. ¶ 25.) In March, 2007, Dr. Holdsworth commissioned a survey of the Cumberland Property, which was completed on March 22, 2007 (the "Titcomb Survey"). (May 13, 2010 Order granting summary judgment to the defendants in *Earl Holdsworth, et al., v. David Higgins, et al.*, Docket No. CV-09-35 ("5/13/10 MSJ Order"), 1-3.) The Titcomb Survey showed the driveway was located entirely on the Holdsworths' property. (Transcript of Attorney Seth Brewster Deposition ("Brewster dep."), 9/10-18.) Two prior surveys—the 1991 Lapoint Survey, commissioned by Dr. Holdsworth and the 1969 Blanchard Survey—showed the driveway was divided between the properties. (5/13/10 MSJ Order, 1-3.)

In October 2007, the Holdsworths retained the law firm Verrill Dana LLP, including Attorney Selser, to represent them in the ongoing boundary dispute with Higgins and Rivard. (Pl.'s A.S.M.F., ¶ 25.) As the negotiations failed to progress, Attorney Selser eventually concluded that litigation was necessary to resolve the boundary dispute and referred the matter to fellow Verrill Dana shareholder, Attorney Brewster. (*Id.*) Thereafter, the Holdsworths commenced suit against Higgins and Rivard on or about January 13, 2009 in the Cumberland County Superior Court. (Def.'s S.M.F., ¶ 61.) The Holdsworths alleged that the Cashmans withdrew from negotiations to buy the Cumberland Property due to Higgins and Rivard's assertion that they owned the driveway and the severely restrictive terms for its use they placed

10

on the Cashmans. (*Id.* at ¶ 61, 63.) BSSN represented Higgins and Rivard in this dispute and successfully argued for summary judgment on all counts of the Holdsworths' Complaint against Higgins and Rivard. (*See id.* at ¶¶ 64, 66.) Following the summary judgment Order, the Holdsworths and Higgins and Rivard reached a settlement agreement in September 2010 regarding Higgins and Rivard's outstanding counterclaim to quiet title. (Pl.'s A.S.M.F. ¶ 27.) In the settlement agreement, the parties "agree[d] that 1) the boundary between Higgins' property...and the Holdsworths' property...is as set forth in the [Titcomb Survey], and 2) [Higgins] and [Rivard] have an easement to use the gravel driveway...." (Rair Aff., Exh. 4 (Settlement Agreement).) Plaintiffs filed the present suit against BSSN on December 13, 2012.

## DISCUSSION

"To survive a defendant's motion for a summary judgment, the plaintiff must establish a prima facie case for each element of [their] cause of action." (*Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346.) "The function of a summary judgment is to permit a court, prior to trial, to determine whether there exists a triable issue of fact or whether the question[s] before the court [are] solely...of law." (*Bouchard v. American Orthodontics*, 661 A.2d 1143, 44 (Me. 1995).) Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. (M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653.) A "material fact" is one that can affect the outcome of the case, and a genuine issue exists when there is sufficient evidence for a fact finder to choose between competing versions of the fact. (*Lougee Conservancy v. City-Mortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774.)

Summary judgment is also appropriate if, looking at the record in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, no

11

reasonable juror could find for the non-moving party. (*Id.* at ¶ 14, n. 3 (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)).) This is true "even when concepts such as motive or intent are at issue…if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." (*Dyer. v. Dep't. of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821 (quoting *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007)); *Bouchard v. American Orthodontics*, 661 A.2d 1143, 1144-45 (Me. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted").) Accordingly, a "judgment as a matter of law in a defendant's favor is proper when any jury verdict for the plaintiff would be based on conjecture or speculation." (*Stanton v. Univ. of Maine System*, 2001 ME 96, ¶ 6, 773 A.2d 1045.)

Motions for summary judgment must be supported by citations to record evidence of a quality that would be admissible at trial. (*Levine*, 2001 ME 77, ¶ 6, 770 A.2d at 656 (citing M.R. Civ. P. 56(e).) Facts supported by record citations in a supporting or opposing statement of materials facts are deemed admitted unless properly controverted. (M.R.Civ. P. 56(h)(4); *see also Farrell v. Theriault*, 464 A.2d 188, 194 (Me. 1983).) Affidavits in support of motions for summary judgment must "be made on personal knowledge" and must "show affirmatively that the affiant is competent to testify to the matters stated therein." (*Platz Associates v. Finley*, 2009 ME 55, ¶ 16, 973 A.2d 743 (quoting M.R. Civ. P. 56(e).)) When ruling on a motion for summary judgment, courts are only required to consider "the portions of the record referred to, and the material facts set forth, in the parties' statement of material facts to determine whether there is no genuine dispute of material fact." (*Lubar v. Connelly*, 2014 ME 17, ¶ 34, 86 A.3d.)

12

### 1. There Are Genuine Issues of Material Fact as to Whether BSSN Caused Plaintiffs to Lose the Sale of the Cumberland Property to the Cashmans.

Causation is an essential element to each of Plaintiffs' causes of action. Absent causation, summary judgment is warranted. (*See e.g. Tri-Town Marine, Inc. v. J.C. Milliken Agency, Inc.*, 2007 ME 67, ¶ 11, 924 A.2d 1066.) Causation is a question of fact, requiring proof that there is some reasonable causal connection demonstrated in the record between the act or omission of the defendant and the damage that the plaintiff has suffered. (*McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 8, 43 A.3d 948.) In the context of a professional negligence claim, a Plaintiff can survive summary judgment on the issue of causation only if Plaintiff can generate through expert testimony sufficient evidence that a breached duty proximately caused an injury or loss to the Plaintiff. *Corey v. Norman, Hanson and DeTroy*, 1999 ME 196, ¶13. Setting aside for moment the issues of whether BSSN owed a duty to the Holdsworths and whether any such duty was breached, the Court finds that Plaintiffs have generated through expert testimony a genuine issue of fact on the element of proximate causation.

BSSN argues that none of their acts or omissions caused the Holdsworths to lose the sale of the Cumberland Property to the Cashmans. (Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law ("Def.'s MSJ Brief"), 13-15.) First, BSSN points out that it was always open to the Holdsworths to resolve the driveway issue by building a new driveway, indisputably on their land. (*Id.* at 13.) Although the record supports this contention, it is a counterfactual scenario and does not impact the causation analysis.

BSSN also argues that Attorney Van Hemel's easement deed provided Higgins and Rivard with the protection they wanted and that regardless of who had represented them, they would have made the same decision to reject the Cashmans' final easement deed offer. In support of this argument, BSSN points to the affidavit of Higgins and Rivard in which they state

13

that it was their decision, not Attorney Van Hemel's, to reject the Cashmans' final offer, and that they were "wary of signing an easement deed at all; we knew we had no obligation to do so; and from the outset we had three major concerns none of which were satisfactorily addressed by the Easement Deed presented to us." (Higgins and Rivard Aff. ¶ 19.)

In response, Plaintiffs argue there is a genuine issue of material fact regarding whether a different attorney could have successfully negotiated an easement deed. (Pl.'s Opp. Brief, 20-21.) Plaintiffs' Additional Statement of Material Facts supports this view by citing to the testimony of their expert witness, Attorney Johnson.[2] When asked whether the easement negotiations could have turned out differently with a different attorney representing Higgins and Rivard, Attorney Johnson opined that:

> It depends...in part on who the subsequent lawyers were. If we go back to Higgins expressed interests for same use, protect me from liability...the Cashmans would have agreed, and so if you assume that as a fact, then, yes, it would have gotten done.

(Johnson dep., 211/1-7.) Johnson also opined that if a different lawyer had represented Higgins and Rivard and "did what Higgins asked the lawyer to do" the easement negotiations could have turned out differently. (*Id.* at 211/10-11.) Viewing the facts in the light most favorable to Plaintiffs, and assuming for the sake of argument that the BSSN attorney violated a duty owed to Plaintiffs in the decisions he made about the negotiations, the Court agrees there is a genuine issue of material fact as to whether a different attorney using a different approach to the

---

[2] Throughout their entire Opp. Brief, Plaintiffs do not provide any record citations or citations to their statements of fact in support of their claims. When ruling on a motion for summary judgment, courts are only required to consider "the portions of the record referred to, and the material facts set forth, in the parties' statement of material facts to determine whether there is no genuine dispute of material fact." (*Lubar*, 2014 ME 17, ¶ 34, 86 A.3d.) While not required, in the interests of justice, the Court has reviewed Plaintiffs' statements of facts in search of facts, record citations, and even arguments in support of Plaintiffs' Opp. Brief.

14

negotiations could have successfully negotiated an easement deed between Higgins and Rivard and the Cashmans.

BSSN also argues there is no causation between their representation of Higgins and Rivard and the loss of the Holdsworths' sale to the Cashmans because the easement issue ultimately became moot. Following the collapse of the easement negotiations in December 2006, the Cashmans sent the Holdsworths a new Purchase and Sale Agreement to buy the Cumberland Property for $1,100,000 provided that the Holdsworths build a new driveway, indisputably on their land, and install underground utility lines to the house. (Def.'s MSJ Brief, 14.) The Holdsworths agreed that spending $20,000 to build the driveway to complete the sale was a "no-brainer." (Def.'s S.M.F., ¶ 34.) Dr. Holdsworth, however, rejected the Cashmans' February 23, 2007 proposal because he felt putting the utilities underground would be a gigantic expense, costing approximately $100,000. (*Id.* at ¶ 50.) In fact, the estimated cost of building the new driveway was $20,000 and the estimated cost of burying the utility lines underground was under $25,000. (*Id.* at ¶¶33, 70.) Dr. Holdsworth did not tell his wife about the proposal and she did not learn about it until his deposition in June 2013. (*Id.* at ¶ 52.) When subsequently asked, Sandra Holdsworth testified that it might have been wise to pay as much as $30,000 to put the utilities underground in addition to $20,000 to build a new driveway in order to close the sale. (*Id.* at ¶ 71.) Dr. Holdsworth admitted he may have ignored the Cashmans' last offer because he was angry they were nickel and diming him. (*Id.* at ¶ 51.) Accordingly, BSSN argues they did not cause the Holdsworths to lose the sale to the Cashmans because the Holdsworths could have clinched a $1,100,000 sale by agreeing to a condition that would have cost them no more than $45,000.

15

Assuming, again for the sake of argument, that Plaintiffs could have completed the sale to the Cashmans had they agreed to build a new driveway entirely on their property and install underground utility lines to the house, this hypothetical sale speaks more to an opportunity to mitigate damages than it does causation. "A plaintiff's duty to mitigate damages arises after he or she has suffered an injury or loss, and focuses on whether the plaintiff took reasonable steps to avoid or reduce damages that were proximately caused by the negligence of the defendant." (*Searles v. Fleetwood Homes of Pennsylvania, Inc.*, 2005 ME 94, ¶ 38, 878 A.2d 509.) Here, there is a genuine issue of material fact as to whether BSSN caused the Plaintiffs to lose the initial purchase offer from the Cashmans. Rather than supersede BSSN's alleged interference with the first purchase offer, the second purchase offer from the Cashmans simply provided the Holdsworths an opportunity to mitigate their damages. (*See* Restatement (Second) of Torts §§ 440-453 (1965) (addressing superseding causes in negligence actions).)

Having determined there is a genuine issue of fact regarding whether BSSN caused Plaintiffs to lose the sale of the Cumberland Property to the Holdsworths, the Court next addresses whether any reasonable juror could find BSSN breached a duty owed to the Plaintiffs, or committed any wrongful acts or omissions.[3]

---

[3] Although not raised directly by any Party, an issue exists as to how—and if—BSSN's alleged violations of the Bar Rules (i.e. BSSN's representation of Higgins and Rivard) support Plaintiffs' negligence claim. The Court notes that nothing in the Rules indicates that a violation of the Rules, by itself, necessarily gives rise to a civil or criminal cause of action. Indeed, the Rules suggest the contrary. (*See* Rule 1(a) (discussing disciplinary proceedings without mentioning their impact on potential civil or criminal proceedings arising therefrom); Rule 2(a) (explaining the purpose of the Rules is to determine fitness of attorneys—amongst others—to continue in capacity as officers of the court without mentioning potential civil or criminal proceedings arising from adverse determination); former Rule 3.1(a) (noting impact of violating the Rules without mentioning impact on potential civil or criminal proceedings arising therefrom); Rule 7.3(c)(1) (investigation or prosecution for violation of Rules not ordinarily deferred in light of pending criminal or civil litigation involving substantially similar material allegations); Rule 7.3(c)(2) (judgment in favor of attorney in civil action involving substantially similar material

16

## 2. There Are No Genuine Issues of Material Fact as to Whether the Plaintiffs were Current Clients of BSSN When BSSN Represented Higgins and Rivard in the Easement Negotiations.

Plaintiffs allege that they were current clients of BSSN when the firm commenced its representation of Higgins and Rivard in the easement negotiations on or about October 26, 2006. As current clients, Plaintiffs maintain the Maine Bar Rules ("Rules") prevented BSSN from representing Higgins and Rivard in the easement negotiations. For purposes of their MSJ, BSSN do not dispute that their representation of Higgins and Rivard was potentially adverse to the Holdsworths. (Def.'s MSJ Brief, 6.) Instead, BSSN maintain that the Holdsworths were former, not current, clients after November 2005.

At all times pertinent to the present motion, Maine Bar Rules 3 through 3.9 were in effect and provided the operative law governing the rules of professional responsibility for attorneys in Maine.[4] Rule 3.15(c) defined a "client" as "a person, public officer or corporation...who is being rendered professional legal services by a lawyer." Rule 3.15(e) defined a "former client" as "a client for whom the lawyer previously rendered and then terminated professional legal services, and for whom the lawyer is not currently rendering any such legal services." Legal services terminate "upon the earlier of the following...[5]:

---

allegations as disciplinary proceedings does not require abatement of disciplinary proceedings); *see also* M.R. Prof. Conduct Preamble ¶ (20) ("Violation of a Rule [of Professional Conduct] should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached...[The Rules] are not designed to be a basis for civil liability").)

[4] Effective August 1, 2009, the Code of Professional Responsibility contained in Maine Bar Rules 3 through 3.9 was abrogated in favor of the Maine Rules of Professional Conduct.

[5] The text omitted from Rule 3.4(a) reads "provided that all conditions and terms of Rule 3.5 have been satisfied." Rule 3.5 concerns permission for withdrawal from representation of a client in a proceeding in court or another tribunal. Rule 3.5 does not apply because BSSN did not represent the Holdsworths in litigation.

17

i. A date expressly or implicitly stated in an oral or written statement by the client to the lawyer, terminating representation;

ii. A date expressly or implicitly communicated by the lawyer to the client, orally or in writing, sent to the client at the client's last known address, withdrawing from or terminating the representation; or

iii. The completion of the services which were the subject of the representation.

(M. Bar R. 3.4(a)(3).)

Viewing the facts in the light most favorable to Plaintiffs, the Court finds no reasonable juror could conclude the Holdsworths were current clients of BSSN after November 2005, when BSSN completed its services for the sale of Dr. Holdsworth's dental practice. Prior to 2003, BSSN had not performed any legal work for Plaintiffs since 1994. (Def.'s S.M.F., ¶¶ 21, 7-9.) During that span of time, Dr. Holdsworth had retained other attorneys to assist him with various legal matters. (*See id.* at ¶¶ 12-18.) From 2003 until November 2005, BSSN represented Dr. Holdsworth in the sale of his dental practice to Dr. Yu. (*Id.* at ¶ 19.) Following the sale, BSSN did not perform any legal work for the Holdsworths after November 2005, and did not send the Holdsworths bills for any legal services rendered thereafter. (*Id.* at ¶¶ 19, 21.)

Plaintiffs do not dispute the above facts, but maintain that the testimony of their expert witness, Attorney Johnson, could lead a juror to conclude the attorney-client relationship had never been terminated. (Pl.'s Opp. Brief, 12.) Plaintiffs appear to rely on the following testimony:

> Because the subject of the representation in this case was the being available to Dr. Holdsworth as his law firm. And if you look at the last matter that Eric Saunders handled for Dr. Holdsworth, which was the selling of his practice, I mean, certainly the services in connection with that were over. But that does not preclude a lawyer and a client from having a broader understanding as to what the scope of the relationship is between those two parties. And a, a lawyer and a client can either agree or through the way that they have dealt with one another

18

over the years, establish an ongoing relationship such that the lawyer-client relationship is not going to be terminated when each isolated legal matter that the lawyer works for is over and then restarted again when the client comes along with some other matter.

(Johnson dep., 122/5-20.) This testimony, however, does not refer to any specific behavior or facts in support of its conclusion. Instead, it is a bare legal conclusion, insufficient to create a genuine issue of material fact. (*See e.g. Tondreau v. Sherwin-Williams Co.*, 638 A.2d 728, 730 (Me. 1994) ("A court may properly enter a summary judgment in a case when the parties are not in dispute over the facts, but differ only as to the legal conclusions to be drawn from the facts"); *Dow v. United Bhd. of Carpenters and Joiners of America*, 1 F.3d 56, 59 (1st Cir. 1993) (unsubstantiated conclusions are inadequate to block summary judgment) (citing *Local No. 48 v. United Bhd. of Carpenters and Joinders of America*, 920 F.2d 1047, 1051 (1st Cir. 1990)).)

Plaintiffs attempt to buoy Attorney Johnson's testimony by citing two opinions, which allegedly informed his analysis. (Pl.'s Opp. Brief, 12, n. 1.) These opinions, however, are inapposite to the question at issue and provide no support. First, Plaintiffs cite to *Board of Overseers of the Bar v. Mangan*, 763 A.2d 1189, 1192 (Me. 2001) for the proposition that an attorney-client relationship does not require payments of a fee and can be implied from the conduct of the parties without payment of a formal retainer. This proposition, however, does not speak to the questions of when an attorney's representation of a client terminates and whether that client is a former or current client. Second, Plaintiffs cite to *Board of Overseers of the Bar v. Clayton N. Howard, Esq.*, GCF#10-322 (January 17, 2013) for the proposition that the reasonable belief of a client is valid in determining whether a person understandably believes he is a client of the firm. *Clayton Howard*, however, addresses whether an individual had ever been a client of a firm, *not* whether an individual is a current, or former client.

19

Although Plaintiffs Opp. Brief does not offer any facts in support of Attorney Johnson's opinion, their statements of fact provide two. First, Plaintiffs appear to argue Dr. Holdsworth's belief that he remained a current client of BSSN is relevant to the former versus current client determination. *(See* Pl.'s O.S.M.F., ¶¶ 10, 13, 21; Pl.'s A.S.M.F., ¶¶ 3, 4.) Rule 3.4(a)(3), however, presents an objective standard under which the beliefs of the lawyer and client regarding termination of the representation do not inform the analysis. Had the Law Court wished to consider the beliefs of the client, reasonable or not, it knew how. Indeed, in Rule 3.4(a)(2), the Law Court did exactly this concerning the commencement of legal representation:

> Representation of a client shall be deemed to have commenced when the lawyer and the client, by conduct or communication, would each reasonably understand and agree that representation commences…If the client reasonably believes that representation has commenced and the attorney has failed to clarify that it has not, then representation shall have commenced.

Accordingly, Dr. Holdsworth's belief that he remained a current client of BSSN in itself does not create a genuine issue of material fact.[6]

Second, Plaintiffs appear to argue that they remained current clients of BSSN based on conversations between Dr. Holdsworth, Attorney Saunders and Timothy Hepburn. (Pl.'s A.S.M.F., ¶¶ 2, 5.) The only evidence in the record regarding the alleged conversations is Dr. Holdsworth's affidavit statement that:

> While [Attorney] Eric Saunders did not represent me on the potential sale of the Cumberland property other than to intercede with [Attorney] Van Hemel in January 2007, it is my belief and understanding Eric Saunders through conversations with me and/or me and Timothy Hepburn from time to time understood the importance of my maximizing the income that I would receive from the sale of my property in terms of my overall retirement plan.

---

[6] Similarly, the facts do not support, and Plaintiffs have not argued that, following the sale of Dr. Holdsworth's dental practice, BSSN commenced a new representation of Plaintiffs.

20

(Dr. Holdsworth Aff., ¶ 5.) Dr. Holdsworth's interpretation of what Attorney Saunders understood, however, is inadmissible because it is speculation about Attorney Saunders mental state and is not based on Dr. Holdsworth's personal knowledge as required by M.R. Civ. P. 56(e). (*Peoples Heritage Savings Bank v. Pease*, 2002 ME 82, ¶ 25, 797 A.2d 1270.) The only portion of Dr. Holdsworth's testimony that is admissible is the implicit statement that Dr. Holdsworth had conversations with Attorney Saunders and/or Timothy Hepburn, from time to time, in which the importance of maximizing his income from the sale of the Cumberland Property in terms of his retirement plan was expressed. Viewed in the light most favorable to Plaintiffs, however, there is still no genuine issue of material fact about whether the Holdsworths were current or former clients of BSSN from November 2005 onward. Even assuming the conversation(s) with Attorney Saunders took place after the sale of Dr. Holdsworth's dental practice—which Plaintiffs do not allege—a discussion regarding the importance of the sale of the Cumberland Property by itself is not a sufficient basis for a juror to conclude BSSN continued to represent the Plaintiffs. Indeed, when considered against the undisputed facts that BSSN did not perform any legal work for the Holdsworths after November 2005, did not send them any bills for legal services rendered after that date, and did not specifically represent Plaintiffs in the sale of the Cumberland Property, it is clear that no reasonable juror could find the Holdsworths remained current clients of BSSN after November 2005.

Plaintiffs also raise two other arguments, neither of which creates a genuine issue of material fact. First, Plaintiffs argue that there are many examples in the legal profession where the attorney-client relationship continues even after a particular case has finished. (Pl.'s Opp. Brief, 12.) In particular, Plaintiffs point to the long-standing relationships that can exist between an insurance company and a particular law firm. Plaintiffs, however, cite no authority to indicate

that the longstanding client remains a current client throughout the relationship. (*Id.*) Indeed, this position is contrary to the plain language of Rule 3.4(a)(3)(iii) and the definition of a former client in Rule 3.15(e). While attorneys may maintain longstanding relationships with a particular preferred client and make business decisions to turn down other potential clients when they conflict with that of the preferred client, those relationships and business decisions do not make the preferred client a perpetual current client. Instead, that client becomes a former client when the attorneys have completed the subject matter of their prior representation and are not currently representing the client in any matter. That the client may—and is likely—to become a current client again does not change the analysis.

Second, Plaintiffs argue BSSN has presented "no legal precedent which clearly establishes how many times a firm must work for a particular client during a particular amount of time in order to [sic] as a matter of law [sic] determine whether a client can be current as opposed to former." (Pl.'s Opp. Brief, 12-13.) This argument is meritless because it has no legal basis and ignores the language of Rules 3.4(a)(3) and 3.15 informing the former versus current client determination.

Accordingly, although the Court can understand Plaintiffs' sense of betrayal, it is simply not the law in Maine that (to paraphrase) "once a client, always a current client." The Court therefore grants BSSN's Motion for Summary Judgment on Plaintiffs' claim that BSSN commenced an inappropriate representation against a current client.[7]

_____

[7] Aside from their argument that Plaintiffs were current clients of BSSN at the time they represented Higgins and Rivard, Plaintiffs have offered no additional arguments in support of their claim that BSSN performed an improper "dual representation" of themselves and Higgins and Rivard in the easement negotiations. Accordingly, because there is no genuine issue of material fact as to whether BSSN represented Plaintiffs after November 2005, the Court also grants BSSN's Motion for Summary Judgment on Plaintiffs' dual representation claim.

**3. There Are No Genuine Issues of Material Fact as to Whether BSSN Needed to Obtain Plaintiffs' Informed Written Consent Before Representing Higgins and Rivard in the Easement Negotiations.**

Having determined that Plaintiffs were former clients of BSSN following the sale of Dr.

Holdsworth's dental practice, the next question raised by BSSN's MSJ concerns what duties, if

any, BSSN owed Plaintiffs as former clients. Then effective Rule 3.4(d)(1)(i), provided that:

> Except as permitted by this rule, a lawyer shall not commence representation adverse to a former client without that client's informed written consent if such new representation is substantially related to the subject matter of the former representation or may involve the use of confidential information obtained through such former representation.

Accordingly, BSSN only needed to obtain Plaintiffs informed written consent if their

representation of Higgins and Rivard in the easement negotiations was substantially related to

their former representation of Plaintiffs *or* if their representation of Higgins and Rivard could

involve the use of confidential information obtained through BSSN's former representation of

Plaintiffs.

### *A.    Substantially Related*

While the Bar Rules do not define what constitute "substantially related" matters, the

comments to current Rule of Professional Conduct 1.9 provide, in pertinent part, that:

> *In accordance with prior Maine law*, matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there is otherwise a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.[8]

(M.R. Prof. Conduct 1.9 cmt. (3) (emphasis added).)

---

[8] The determination of whether matters are substantially related due to the presence of confidential factual information is encompassed by the broader test in Rule 3.4(d)(1)(i) requiring informed written consent if the new representation "may involve the use of confidential information obtained through such former representation." Accordingly, the Court will address issues related to confidential information in the subsection B, *infra*.

23

The Comment goes on to provide a number of examples illustrating the Rule's application. One pertinent example explains that:

> [A] lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds no reasonable juror could conclude that BSSN's representation of Higgins and Rivard involved the same transaction or dispute of any former BSSN representation of the Holdsworths. Plaintiffs do not dispute that BSSN has never represented or advised them regarding the Cumberland Property. (Def.'s S.M.F., ¶ 22.) Indeed, prior to October 2006, no one at BSSN was aware of the fact that the Holdsworths shared a driveway with Higgins and Rivard. (*Id.* at ¶ 22.)

While BSSN did represent Dr. Holdsworth in the sale of his dental practice, that representation was unrelated to the easement negotiations. The sale of Dr. Holdsworth's dental practice, on the one hand, involved structuring, monitoring, and executing the sale of a professional corporation. The sale involved Dr. Yu purchasing 50% of the stock in Dr. Holdsworth's professional corporation in 2003. (*Id.* at ¶ 19.) Dr. Yu then practiced with Dr. Holdsworth for two years, before purchasing the remaining 50% of stock in October 2005. (*Id.* at ¶ 19.) This purchase closed the dental practice sale, and after November 2005, BSSN did not perform any more legal work regarding the sale. (*Id.* at ¶¶ 19, 21.) The easement negotiations, on the other hand, involved separate facts, legal issues, and parties. In particular, the easement negotiations involved BSSN's representation of Higgins and Rivard in negotiations to execute an easement deed regarding the Cashmans' ability to use the driveway leading to the Cumberland House. (*See id.* at ¶¶ 38-39, 43.)

24

Plaintiffs do not directly dispute that BSSN's representation of Dr. Holdsworth in the sale of his dental practice did not involve the same transaction or dispute as the easement negotiations. Instead, they argue that Dr. Holdsworth had "sufficient contact with [Attorney] Saunders over the years by which Saunders knew or became aware the sale of the Cumberland property was a lynchpin in the successful execution of the Holdsworth overall retirement plan." (Pl.'s Opp. Brief, 15.) In essence, Plaintiffs appear to argue that BSSN's prior representation of Dr. Holdsworth extended beyond the sale of his dental practice to a general representation for the execution of Plaintiffs' retirement plan. Based on the Court's review of the record, the only evidence in support of this position is paragraph five of Dr. Holdsworth's Affidavit. As discussed above in section 2, the only admissible portion of this statement is that Dr. Holdsworth had conversations with Attorney Saunders, and/or Timothy Hepburn, from time to time, in which the importance of maximizing Dr. Holdsworth's income from the sale of the Cumberland Property in terms of his retirement plan was expressed. (Dr. Holdsworth Aff., ¶ 5.) However, Attorney Saunders' knowledge of the importance of the sale—by itself—does not transform BSSN's former representation of Dr. Holdsworth in the sale of his dental practice into a broader representation regarding the execution of Plaintiffs' retirement plan. In order to reach such a conclusion, the Court would have to make improbable inferences based on mere speculation. This is not permitted. (*Dyer.*, 2008 ME 106, ¶ 14, 951 A.2d 821 (quoting *Vives*, 472 F.3d at 21 (1st Cir. 2007); *Stanton*, 2001 ME 96, ¶ 6, 773 A.2d 1045.)

An example in the comments to Rule 1.9 of the Maine Rules of Professional Conduct provides additional support to this conclusion. In the example, the attorney's representation of tenant's in an eviction suit was not substantially related to the attorney's former representation of the landlord in obtaining environmental permits. (M.R. Prof. Conduct 1.9 cmt. (3).) Here, the

matters bear even less relation because BSSN's representation of Higgins and Rivard in the easement negotiations does not concern the same property or business as BSSN's former representation of Dr. Holdsworth. Furthermore, to accept that BSSN's representation of Dr. Holdsworth was for the general execution of his retirement plan—based on the facts presented— would be equivalent to accepting an argument that the shopping center's former attorney could not represent the tenants because the eviction proceeding was related to the attorney's general representation of the shopping center based solely on conversations the shopping center had with the attorney about plans for running a profitable business. Accepting Plaintiffs argument would effectively rewrite Rule 3.4(d)(1)(i) to prohibit all attorneys from accepting any representation adverse to a former client. While the Plaintiffs are likely not alone in assuming that an attorney may not, under any circumstances, accept a representation adverse to a former client, that is not the standard the Court must apply. As with the issue of whether the Holdsworths were current or former clients of BSSN, the Plaintiffs' sense of betrayal does not necessarily equate with a violation of rules governing the conduct of attorneys in Maine.

### B. Confidential Information

As noted in footnote 8, *supra*, the risk that confidential information obtained in the prior representation will be used in the new representation triggers the tougher standard of Rule 3.4(d)(1)(i). Rule 3.4(d)(1)(i) requires attorneys to obtain their former client's informed written consent if the new representation "may involve the use of confidential information obtained through such former representation." What constitutes confidential information is explained in Rule 3.6(h), which states, in pertinent part, that:

> [A] lawyer shall not, without informed consent, knowingly disclose or use information (except information generally known) that:

26

>      (i)       is protected by the attorney-client privilege in any jurisdiction relevant to the representation;
>
>      (ii)     Is information gained in the course of representation of a client or former client for which that client or former client has requested confidential treatment; [or]
>
>      (iii)    Is information gained in the course of representation of the client or former client and the disclosure of which would be detrimental to a material interest of the client or former client
>
>   ...

(M. Bar R. 3.6(h)(1).)

Here, BSSN argues their representation of Higgins and Rivard did not involve the use of confidential information obtained from the Holdsworths through former representations. In support of this position, BSSN argues that they never represented the Holdsworths with regard to the Cumberland Property, did not know that the Holdsworths shared a driveway with Higgins and Rivard, and that Attorney Sanders did not know where the Holdsworths lived—even though it was only a mile from his house. (Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment ("Def.'s Reply Brief"), 10.) BSSN also argues that Plaintiffs' own expert conceded there was no evidence of any such use of confidential information. The Court notes that although Attorney Johnson conceded he was not aware of any pertinent confidential information obtained by BSSN, this concession is not determinative of the absence of such information. (Johnson dep., 164/20-165/20.)

Although Plaintiffs' have not explicitly argued BSSN's representation of Higgins and Rivard involved the use of confidential information, the Court will address this issue because the function of summary judgment is to determine whether triable issues of fact exist. (*See Bouchard*, 661 A.2d at 1144.) Here, viewing the facts in the light most favorable to Plaintiffs, the Court finds no reasonable juror could conclude that BSSN's representation of Higgins and

27

Rivard might involve the use of confidential information obtained through BSSN's former representation of the Holdsworths.

While attorneys at BSSN had performed estate-planning services for the Holdsworths in the past, the most recent instance was—at the latest—in 1986. (Def.'s S.M.F., ¶ 6.) Furthermore, the wills and trust instrument drafted by BSSN for the Holdsworths were prepared in 1972 and were subsequently superseded by instruments prepared by a non-BSSN attorney. (Def.'s S.M.F., ¶¶ 6, 17.) Accordingly, the passage of at least 20 years combined with the fact that these instruments were superseded render whatever confidential information BSSN may have obtained through their estate planning services obsolete. (*See* M.R. Prof. Conduct 1.9 cmt. (3) ("Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two matters are substantially related").)

The only other evidence in the record supporting the potential presence of pertinent confidential information is paragraph 5 of Dr. Holdsworth's Affidavit, discussed in Section 2, *supra.* (Dr. Holdsworth Aff., ¶ 5.) Attorney Saunders' knowledge that the sale of the Cumberland Property was important for Dr. Holdsworth's retirement plan, however, is not confidential information because it is generally known that every seller in an arms length deal wants to get the best price he can. Although, the Court is required to view the facts in the light most favorable to the Holdsworths and to draw reasonable inferences in their favor, the Court may not make improbable inferences or rely on speculation in ruling on a motion for summary judgment. In order to find that a genuine issue of fact exists as to whether BSSN obtained pertinent confidential information from Plaintiffs, the Court would have to do exactly that. (*Dyer.*, 2008 ME 106, ¶ 14, 951 A.2d 821 (quoting *Vives*, 472 F.3d at 21 (1st Cir. 2007);

28

*Stanton*, 2001 ME 96, ¶ 6, 773 A.2d 1045; *see also Thomure. v. Phillips Furniture Co.*, 30 F.3d 1020, 1025 (8th Cir. 1994) (employer's suggestion to employee that he "might want to consider retirement" rather than accept a pay cut found not probative of age discrimination); *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 481 (1st Cir. 1993) (supervisor's statement that company sheltered "no sacred cows" insufficient to raise inference of age discrimination); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 826 (1st Cir. 1991) (supervisor's comment that he was "sad to lose the youth of the work force" did not, by itself, raise an inference of bias against older employees); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir.1990) (affirming summary judgment for employer despite supervisor's comment that he chose plaintiff's replacement because the latter was "a bright, intelligent, knowledgeable young man").)

### C. *Additional Arguments Raised by Plaintiffs*

Plaintiffs also raise four additional arguments opposing BSSN's MSJ. First, Plaintiffs argue BSSN was required to obtain their informed written consent based on BSSN's alleged admission that a conflict of interest existed. (Pl.'s Opp. Brief, 13-14.) This argument, however, is based on the mistaken assumption that BSSN's interpretation of the law is determinative of whether BSSN complied with the law. Rule 3.4(d)(1)(i) lays out an objective test that does not include the beliefs of the lawyer regarding whether a conflict of interest exists. Accordingly, BSSN's alleged admissions that a conflict of interests existed are irrelevant and do not create a genuine issue of material fact.

Second, Plaintiffs argue BSSN did not act properly concerning their representation of Higgins and Rivard against the Holdsworths. (Pl.'s Opp. Brief, 14.) This argument is inapposite to the question of whether BSSN needed to obtain the Holdsworths' informed written consent before representing Higgins and Rivard in the easement negotiations. For example, Plaintiffs

29

discuss how Attorney Van Hemel allegedly failed to explain in detail to Higgins the possible effects of the counter proposal to the easement deed he put together. (*Id.*) Similarly, Plaintiffs note that Attorney Van Hemel informed Higgins and Rivard that the Holdsworths might be trying to set them up for an interference with contractual relationship claim. (*Id.*) These arguments are not pertinent to whether BSSN's former representation of Dr. Holdsworth was substantially related to their present representation of Higgins and Rivard or could involve the use of confidential information obtained in the former representation. To the extent the arguments are intended to show BSSN's representation of Higgins and Rivard was adverse to the Plaintiffs, the Court notes that for the purposes of their MSJ, BSSN has conceded the representations were adverse. (Def.'s MSJ Brief, 6.)

Third, Plaintiffs appear to argue that there is a genuine issue of material fact regarding whether BSSN's representation of Higgins and Rivard was adverse to the Holdsworth's retirement plan. (Pl.'s Opp. Brief, 15.) Whether BSSN's representation was adverse to the Holdsworths, however, is not an issue in BSSN's Motion for Summary Judgment. As noted, BSSN does not dispute, for purposes of its MSJ, that their representation of Higgins and Rivard was adverse to Plaintiffs. (Def.'s MSJ Brief, 6.) Furthermore, the fact that a representation is adverse to a former client does not in and of itself require the attorney to obtain the former client's informed written consent. (M. Bar R. 3.4(d)(1)(i).)

Finally, Plaintiffs argue there is a genuine issue of material fact regarding whether BSSN obtained the Holdsworths' informed written consent to represent Higgins and Rivard. (Pl.'s Opp. Brief, 15-16.) This argument is inapposite. The question before the Court is whether BSSN needed to obtain the Holdsworths' informed written consent, *not* whether BSSN had

30

obtained the Holdsworths informed written consent. At least for the purposes of this motion, it is undisputed that BSSN did not obtain the Holdsworths' informed written consent.

For the reasons stated above, the Court grants BSSN's Motion for Summary Judgment on Plaintiffs' claim that BSSN commenced representation adverse to a former client without obtaining the required informed written consent.

### 4. There Are No Genuine Issues of Material Fact as to Whether BSSN Interfered with Plaintiff's Contractual or Prospective Economic Advantage Through Fraud or Intimidation.

BSSN argues that Plaintiffs do not have a viable claim for intentional interference with contract or prospective economic advantage ("intentional interference") because BSSN Attorney Van Hemel did not engage in any intimidating or fraudulent behavior, and was simply carrying out his duty to serve the best interests of his clients, Higgins and Rivard. (Def.'s MSJ Brief, 11-12.) Plaintiffs counter with a list of facts they contend support an intentional interference claim arising out of Attorney Van Hemel's representation of Higgins and Rivard. (Pl.'s Opp. Brief, 18-20.)

"Tortious interference with a prospective economic advantage requires a plaintiff prove: (1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with the contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages." (*Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d 1104.)

To establish a claim of intentional interference by fraud, a plaintiff must show that the defendant (1) made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or refrain from acting in reliance on it, and (5) the other person justifiably relies on the

31

representation as true and acts upon it, thereby causing the plaintiff to suffer damages. (*Id.* at ¶ 14.)

To establish a claim of intentional interference by intimidation, a plaintiff must show the defendant interfered through the use of unlawful coercion or extortion. (*See id.* at ¶ 16.) Black's Law Dictionary defines "extortion," in pertinent part, as "[t]he act or practice of obtaining something or compelling some action by illegal means, as by force or coercion" and "coercion," in pertinent part, as "compulsion by physical force or threat of physical force" and/or "[c]onduct that constitutes the improper use of economic power to compel another to submit to the wishes of one who wields it." (BLACK'S LAW DICTIONARY (9th Ed. 2009).)

"The presence of fraud or intimidation is critical to a claim for tortious interference because it distinguishes unlawful conduct from conduct inherent in a healthy competitive economic environment." (*Rutland*, 2002 ME 98, ¶13, n.5, 798 A.2d 1104.) For that reason, "a person who claims to have, or threatens to lawfully protect, a property right that the person believes exists cannot be said to have intended to deceive or to have unlawfully coerced or extorted another simply because that right is later proven invalid." (*Id.* at ¶ 16.) (vacating judgment finding tortious interference with prospective economic advantage because the evidence offered to prove fraud and intimidation showed only that the party intended to vigorously preserve a claim of right that was subsequently proven invalid).)

Viewing the facts in the light most favorable to Plaintiffs, no reasonable juror could find BSSN intentionally interfered with the Holdsworths' contract or prospective economic advantage through intimidation or fraud. Plaintiffs claim there is a genuine issue of material fact as to whether Attorney Van Hemel intimidated the Holdsworths by disregarding the instructions he received from his clients, Higgins and Rivard. (Pl.'s Opp. Brief, 18-19.) In particular, Plaintiffs

32

allege Attorney Van Hemel's behavior was intimidating because he: 1) purposefully or recklessly disregarded his prime directive from Higgins not to interfere with the sale to the Cashmans; 2) bragged to opposing counsel about how caustic and unproductive his behavior had been towards Dr. Holdsworth; and 3) sent a counter proposal to the Cashmans knowing he would not let his own clients sign such a proposal. (*Id.*) Based on the Court's review of the record, Plaintiffs' assertions are supported by: 1) Attorney Van Hemel's deposition testimony that Higgins and Rivard expressed a desire and concern to Attorney Van Hemel that they not "mess up the sale" of the Cumberland Property to the Cashmans (Van Hemel dep., 185/3-10); and 2) Attorney Selser's Affidavit statement that Attorney Van Hemel disregarded this concern by drafting a proposed easement, as part of a negotiation strategy, that Attorney Van Hemel allegedly described as "over the top," "excessive," and something he "would not advise his clients to accept" (Selser Aff, ¶ 6). While there is an issue of fact as to whether Attorney Van Hemel disregarded his client's instructions by drafting and boasting about an "over the top" counter proposal, it is not a material issue because this behavior, by itself, does not demonstrate or insinuate any intimidating—i.e. coercive or extortionate—behavior. Reasonable minds may differ as to the wisdom of Attorney Van Hemel's tactics, but no reasonable juror could conclude that such behavior, by itself, was intimidating. More fundamentally, Attorney Van Hemel's alleged behavior was directed towards the Cashmans, not the Holdsworths. Plaintiffs have not explained how they were intimidated by this behavior when they were not directly involved in the easement negotiations.

Plaintiffs also argue that Attorney Van Hemel and fellow BSSN Attorney Ted Small could be viewed as attempting "to intimidate or even defraud Holdsworth" by "maintaining a misrepresentative position about whether they could disprove the accuracy of the Titcomb

33

Survey and the poor treatment of Holdsworth during his deposition[.]"[9] (Pl.'s Opp. Brief, 20.) Regarding the Titcomb Survey, Plaintiffs appear to support this argument by citing to the deposition of Seth Brewster. Mr. Brewster stated that he pursued an interference with contractual relations claim in *Earl Holdsworth, et al., v. David Higgins, et al.*, Docket No. CV-09-35 because Higgins and Rivard asserted they owned the property on which the gravel driveway was located even though the Titcomb Survey showed the driveway was entirely on the Holdsworths' property. (Brewster dep. 9/10-18.) Mr. Brewster further opined that he did not believe there was "any admissible evidence that the gravel driveway was, in fact, located on the Higgins/Rivard property," and that he was informed there was "no survey that essentially rebutted the Titcomb survey[.]" (*Id.* at 13/4-11, 10/6-18.) Mr. Brewster did recognize, however, that "there was a survey performed in 1968 or 1969 called the Blanchard survey" although he opined that the Titcomb Survey determined the Blanchard Survey was "inaccurate or wrong[.]" (*Id.* at 10/13-18.) Finally, Plaintiffs appear to point to their settlement agreement with Higgins and Rivard, in which they adopted the boundary provided in the Titcomb Survey. (Rair Aff., Exh. 4 (Settlement Agreement, ¶ IV.)

BSSN did not respond to the above argument, but their Reply Statement of Facts notes that BSSN and Attorney Van Hemel relied on two earlier surveys that showed the boundary line running down the middle of the driveway. (Def.'s Reply to Pl.'s A.S.M.F., ¶ 25.)[10] The older

---

[9] Plaintiffs have not—and cannot—allege that the Cashmans were intimidated or defrauded by BSSN's behavior regarding the accuracy of the Titcomb Survey because they have not alleged any facts demonstrating that BSSN had any contact with the Cashmans regarding the Cumberland Property after the Titcomb survey was completed on March 22, 2007.

[10] BSSN cites to Van Hemel dep., 90/12-14, 92/22-94/4. BSSN did not, however include pages 93 and 94 in the record submitted to the Court. While the Court cannot entertain matters not included in the record, the Court notes that additional evidence within the record supports BSSN's contention. (*See* 5/13/10 MSJ Order, 1-3; Complaint filed in *Earl Holdsworth, et al., v. David Higgins, et al.*, Docket No. CV-09-35 ("Holdsworth v. Higgins Complaint"), ¶¶ 9, 24.)

34

survey, the Blanchard Survey, was carried out in 1969, while the more recent survey, the Lapoint Survey was carried out in 1991 and commissioned by Dr. Holdsworth. (5/13/10 MSJ Order, 13; Transcript of Dr. Earl Holdsworth Deposition from September 8, 2009 ("Dr. Holdsworth 9/08/09 dep."), 30/7-15.) Taking into account the nature of surveys, which can be carried out using different methods that may arrive at different conclusions, the Court finds no reasonable juror could conclude Attorney Van Hemel, as attorney for Higgins and Rivard, knowingly, or with reckless disregard, made a false statement of fact. The fact that Plaintiffs and Higgins and Rivard adopted the boundary provided in the Titcomb survey is not dispositive of this issue as it was part of an agreed upon settlement, not a court opinion. Indeed, even if the surveys BSSN cited to in their representation of Higgins and Rivard turned out to be false, a claim to protect a property right that Higgins and Rivard believed to exist could not constitute intimidating or fraudulent behavior. (*Rutland*, 2002 ME 98, ¶ 13, n.5, 798 A.2d 1104.) Further undercutting Plaintiffs' claim is the fact that they have not alleged any justifiable reliance on Attorney Van Hemel's alleged representations. To the contrary, the record indicates that the Holdsworths retained attorneys to actively dispute Attorney Van Hemel's position. (Pl.'s A.S.M.F., ¶ 25.)[11]

Plaintiffs have also offered no facts in support of their statement that the alleged poor treatment of Dr. Holdsworth during his deposition intimidated him. In addition to lacking any factual support, this proposition is further undercut by the fact that Dr. Holdsworth was represented by counsel during the deposition and that the sale to the Cashmans had long since fallen apart by the time Dr. Holdsworth was deposed. (*See generally* Holdsworth dep.)

---

[11] Plaintiffs do not direct the court to, and the record does not contain, any facts in support of a claim that Attorney Van Hemel somehow intimidated Plaintiffs by maintaining he could disprove the accuracy of the Titcomb survey.

35

Lastly, Plaintiffs argue that a juror could view the Cashmans as intimidated by Van Hemel's behavior since they viewed the counter proposal deed as "insulting" and "insane." This assertion, however, is also completely lacking in factual support. No reasonable juror could conclude that the counter proposal proffered by Attorney Van Hemel coerced or extorted the Cashmans into modifying their proposal or even their behavior. To the contrary, the Cashmans—who were represented by counsel—responded to Attorney Van Hemel's proposal with a final take it or leave it offer. (Def.'s S.M.F., ¶ 44.)

Accordingly, the Court grants BSSN's Motion for Summary Judgment on Plaintiffs' claim for intentional interference with contract or prospective economic advantage.

## CONCLUSION

The Court concludes that BSSN is entitled to summary judgment, as a matter of law, on all of the claims raised against them by Plaintiffs. While Plaintiffs raised a genuine issue of material fact as to whether BSSN's behavior caused their losses, causation absent liability is insufficient to maintain a claim for professional negligence. And because the Court has determined BSSN is not liable to Plaintiffs for any claim made, the Court does not reach BSSN's arguments regarding damages.

The entry will be: Defendant's Motion for Summary Judgment is GRANTED.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: June 6, 2014

Justice Michaela Murphy
Business and Consumer Docket

36

**Earl Holdsworth and Sandra Holdsworth v. Bernstein, Shur, Sawyer & Nelson, P.A.**
**BCD-CV-13-03**


**Earl Holdsworth and Sandra Holdsworth**
    **Petitioners / Plaintiffs**

    Counsel:                Michael Rair, Esq.
                              43 Columbia Street, Suite 1
                              PO Box 2580
                              Bangor, ME 04402-2580


**Bernstein, Shur, Sawyer & Nelson, P.A.**
    **Respondents / Defendants**

    Counsel:                John Whitman, Esq.
                              465 Congress Street
                              PO Box 9545
                              Portland, ME 04112-9545